STATE OF CONNECTICUT *v.* RANDALL SAUNDERS
(SC 16816)

Sullivan, C. J., and Borden, Katz, Palmer and Vertefeuille, Js.

Argued January 15, 2003—officially released January 13, 2004

*Lisa J. Steele*, special public defender, for the appellant (defendant).

*Timothy J. Sugrue*, senior assistant state's attorney, with whom, on the brief, were *Walter D. Flanagan*, state's attorney, and *Warren C. Murray*, supervisory assistant state's attorney, for the appellee (state).

*Vicki H. Hutchinson* filed a brief for AWARE as amicus curiae.

*William H. Peterken* filed a brief for Defense Associates as amicus curiae.

*Opinion*

PALMER, J. Following a mistrial, a second jury found the defendant, Randall Saunders, guilty of manslaughter in the first degree with a firearm in violation of General Statutes § 53a-55a (a).[1] The trial court, *Holden, J.*, rendered judgment in accordance with the jury verdict,[2] and the defendant appealed.[3] On appeal, the defendant claims that: (1) the state failed to disprove his claim of self-defense beyond a reasonable doubt; (2) the trial court improperly excluded certain expert testimony in violation of his constitutional right to present a defense; and (3) he was retried in violation of his constitutional

---

[1] General Statutes § 53a-55a provides in relevant part: "(a) A person is guilty of manslaughter in the first degree with a firearm when he commits manslaughter in the first degree as provided in section 53a-55, and in the commission of such offense he uses, or is armed with and threatens the use of or displays or represents by his words or conduct that he possesses a pistol, revolver, shotgun, machine gun, rifle or other firearm. . . ."

General Statutes § 53a-55 provides in relevant part: "(a) A person is guilty of manslaughter in the first degree when: (1) With intent to cause serious physical injury to another person, he causes the death of such person . . . or (3) under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person. . . ."

[2] The trial court sentenced the defendant to a term of twenty-seven years imprisonment.

[3] The defendant initially appealed to the Appellate Court. Because the defendant should have taken his appeal directly to this court; see General Statutes § 51-199 (b) (3); his case was transferred to this court pursuant to Practice Book § 65-4.

right not to be placed in jeopardy twice for the same offense. We reject the defendant's claims and, therefore, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On January 26, 1997, the defendant and his girlfriend, Susan Bruemmer, went to Tortilla Flat, a restaurant and bar in Danbury, after having spent the previous several hours drinking at another bar. The two remained at Tortilla Flat during the Super Bowl and continued to drink. As the defendant and Bruemmer were getting ready to leave after the end of the game, Bruemmer approached the victim, Dominic Badaracco, Jr., who was seated at the bar, and struck up a conversation with him. Bruemmer was acquainted with the victim because she previously had dated his brother. The conversation soon escalated into an argument, which culminated in Bruemmer's throwing a drink in the victim's face.

The victim then called out to the defendant that he had "better contain [his] bitch." The defendant drew a handgun, approached the victim, and placed the barrel of the gun against the victim's head or neck. A fight ensued between the defendant, who is approximately six feet, five inches tall and 220 pounds, and the victim, who was approximately six feet, two inches tall and 230 pounds. The two men proceeded to fight. During the fight, which lasted only a short time, the victim punched the defendant in the face. As a result, the defendant suffered minor injuries including a bloody nose and some cuts and abrasions on his face. The victim's shirt was torn, and a gold chain that he had been wearing around his neck was broken.

As the fight broke out, Bethany McKnight, a bartender, heard someone in the bar yell "there's a gun . . . ." McKnight went into the kitchen to call 911 but discovered that Paula Keeler, the sister-in-law of Dennis

Keeler, one of the owners of Tortilla Flat, already had made the call. Dennis Keeler also entered the kitchen to confirm that the police had been called. By this time, the defendant had entered the kitchen from the bar area. Dennis Keeler noticed that the defendant was holstering his weapon. McKnight and Paula Keeler asked the defendant whether he had been shot and if he wanted them to call for an ambulance. The defendant smiled and said no. Paula Keeler thereafter left the kitchen and went upstairs. At this time, the defendant was located within fifteen feet of a door leading to the outside of the restaurant.

The victim, who had remained in the bar area, headed toward the kitchen. As the victim approached the kitchen doorway, he kicked a garbage can, stopped near the doorway and, according to Dennis Keeler, shouted to the defendant that "if he [the defendant] ever pulled a gun on him again he'd kill him."[4] The victim then continued to move toward the defendant. Dennis Keeler asked the victim "to stop, to let it go . . . ." The victim did not heed Keeler's request, however, and continued to advance in the direction of the defendant.

By this time, the defendant was leaning against a stove, wiping blood from his face. McKnight, who had remained in the kitchen, testified that the defendant pulled out his handgun and "just calm [sic] as a cucumber . . . started firing." The defendant discharged all five of the bullets from his gun. The victim was struck by four of the five bullets, three of which entered through his back.[5] The other bullet struck the victim in

---

[4] Other witnesses testified that they heard the victim make a somewhat different threat. One such witness testified that he heard the victim say, "Nobody puts a gun to my head and lives [un]til tomorrow." A second witness testified that the victim said, "Nobody pulls a gun on me and lives . . . ."

[5] The testimony varied as to the exact sequence of the shots. Three witnesses testified that they heard a single shot followed by a short pause and then several shots in succession. Two other witnesses testified, however, that the shots were fired in succession.

the left arm, near the armpit. The police soon arrived and arrested the defendant. The victim subsequently died as a result of one or more gunshot wounds. Additional facts will be set forth as necessary.

I

The defendant first contends that the state failed to disprove his claim of self-defense; see General Statutes § 53a-19;[6] beyond a reasonable doubt as required by General Statutes § 53a-12 (a).[7] We disagree.

[6] General Statutes § 53a-19 provides in relevant part: "(a) Except as provided in subsections (b) and (c) of this section, a person is justified in using reasonable physical force upon another person to defend himself . . . from what he reasonably believes to be the use or imminent use of physical force, and he may use such degree of force which he reasonably believes to be necessary for such purpose; except that deadly physical force may not be used unless the actor reasonably believes that such other person is (1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm.

"(b) Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using deadly physical force upon another person if he knows that he can avoid the necessity of using such force with complete safety (1) by retreating, except that the actor shall not be required to retreat if he is in his dwelling, as defined in section 53a-100, or place of work and was not the initial aggressor . . . or (2) by surrendering possession of property to a person asserting a claim of right thereto, or (3) by complying with a demand that he abstain from performing an act which he is not obliged to perform.

"(c) Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using physical force when (1) with intent to cause physical injury or death to another person, he provokes the use of physical force by such other person, or (2) he is the initial aggressor, except that his use of physical force upon another person under such circumstances is justifiable if he withdraws from the encounter and effectively communicates to such other person his intent to do so, but such other person notwithstanding continues or threatens the use of physical force . . . ."

[7] General Statutes § 53a-12 (a) provides: "When a defense other than an affirmative defense, is raised at a trial, the state shall have the burden of disproving such defense beyond a reasonable doubt."

Our Penal Code characterizes self-defense as a nonaffirmative defense that the state must disprove beyond a reasonable doubt. See General Statutes § 53a-16 ("[i]n any prosecution for an offense, justification, as defined in sections 53a-17 to 53a-23, inclusive, shall be a *defense*" [emphasis added]).

The following additional facts are necessary to our resolution of this issue. At trial, the defendant did not dispute that he had shot and killed the victim but claimed that he had done so in self-defense. The defendant presented two related theories in justification of his use of deadly force against the victim.[8] First, the defendant contended that he shot the victim because he reasonably believed that the victim was going to shoot him. The defendant's second theory of self-defense was founded on his claim that he reasonably feared that the victim was going to beat him to death.

Both of these theories were based, in large part, on a written statement that the defendant had given to the police upon being taken into custody shortly after the shooting.[9] That statement, which contains a version of

[8] The self-defense claim raised by the defendant, who did not testify, was predicated on the testimony of the state's witnesses, several witnesses who testified in the defendant's case-in-chief and certain documentary evidence.

[9] The defendant's written statement, which was introduced as a full exhibit, provides in relevant part: "On Sunday Jan[uary] 26, 1997 I went to Uncle Al's [Cafe in Danbury] with my girlfriend Susan Bruemmer. We went [to Uncle Al's] at around [6 p.m.] to watch the [Super Bowl]. While at Uncle Al's I had approximately four (4) beers. At half-time Susan wanted to leave and go to Tortilla Flat. When we arrived at Tortilla [Flat] Susan got involved in a card game, and I was watching the [Super Bowl] on the TV. While I was watching the game I had two (2) beers. Approximately forty five minutes to an hour after the game myself [sic] and Susan were getting ready to leave and go home. As we started walking out of the bar area Susan saw [the victim] sitting at the bar [and] she went up to him to say hello, [and] [h]e then got ugly with her. [The victim] turned and said to me is that your bitch you better contain your bitch. I then told Susan lets [sic] go. We then started to walk out the door and [the victim] pushed me and then punched me in the nose, [and] I fell to the floor and [the victim] was on top of me hitting me. I then pulled my gun out and pointed it at him and told him that it was over and to stop or I'll shoot, [the victim] then grabbed my gun. We struggled a while but I didn't let go of the gun, when [the victim] got off of me, I put my gun back in the holster and I ran into the kitchen, I was going to run out the door, but I was concerned where Su[san] was. When I was in the kitchen the next thing I know is that [the victim] was in the kitchen and coming after me, I then pulled my weapon again and pointed it at [the victim] and told him to stop or that I'll shoot. [The victim] then reached around to his back with his hand and I thought that he was reaching for a gun. I then fired my gun, I kept pulling the trigger until the gun was empty.

the events that differs from much of the other evidence adduced at trial, may be summarized as follows. After arguing with Bruemmer, the victim initiated the fight with the defendant by pushing him and then punching him in the face as the defendant was trying to leave the restaurant. The defendant fell to the floor, and the victim jumped on him and continued to punch him. While the two men were struggling, the defendant pulled out his handgun, pointed it at the victim and stated, "[S]top or I'll shoot . . . ." The victim then grabbed the defendant's gun but was unable to wrest it away from him. The victim then disengaged from the defendant, who holstered his gun and ran into the kitchen. The defendant initially thought that he would flee the restaurant but decided not to do so because he was concerned about Bruemmer's whereabouts and safety.

Immediately thereafter, the defendant observed that the victim had entered the kitchen and was "coming after" him. The defendant again pulled out his handgun, aimed it at the victim and told him to stop or he would shoot. The victim continued, however, to move toward the defendant, who observed the victim reaching for something behind his back. Believing that the victim was reaching for a gun, the defendant repeatedly shot the victim from a distance of approximately fifteen to twenty feet. After firing all five of the bullets in his gun, the defendant holstered his gun and stepped away.

The state adduced evidence tending to contradict the factual foundation of the defendant's claim of self-

[The victim] then fell to the floor. When the gun was empty I holstered it and stepped away. Then I saw that some of his friends [were] coming into the kitchen. I was approximately 15 to 20 feet away from [the victim] when I fired the shots."

The defendant also had repeated the substance of this statement in several letters that he sent to Bruemmer. Those letters also were introduced into evidence.

defense. In particular, the state's evidence undermined the veracity of the defendant's version of the incident as reflected in his written statement. First, testimony of certain state's witnesses that the defendant walked over to the bar and placed a gun to the victim's head or neck contradicted the defendant's assertion that the victim had initiated the altercation. Indeed, the defendant did not acknowledge that he had pulled out his gun when he first approached the victim; according to the defendant, he unholstered his gun only after the victim physically had assaulted him. Second, the evidence adduced by the state established that, contrary to the defendant's statement, he did not holster his gun until after he had left the bar area and proceeded into the kitchen. Third, several witnesses testified that they had heard the victim make a statement as he entered the kitchen and approached the defendant, but there was no evidence to corroborate the defendant's assertion that he had warned the victim that he would shoot him if the victim continued to move toward him. Four, the state presented forensic evidence that the defendant was approximately two to three feet from the victim when he fired at him, rather than fifteen to twenty feet away as the defendant had asserted in his statement.

The state also adduced evidence that the defendant was approximately fifteen feet from a door leading to the outside of the restaurant when the victim confronted him in the kitchen. McKnight, who was in the kitchen when the defendant fired at the victim, testified that the defendant could have "gotten out of the kitchen if he wanted. He was right over by the door." Officer Brian Bishop of the Danbury police department, who arrived at the scene soon after the shooting, noted that the door was open.[10]

[10] Officer Bishop testified that "[t]here was a screen door and . . . an interior door which was open. The screen door was closed, but the interior door was open."

Moreover, no witness ever observed the victim in possession of a gun, and no such gun was found, either on the victim's person or elsewhere. In addition, Dennis Keeler, who returned to the kitchen moments after the shooting, testified that he did not see anyone remove anything from the victim's person. Bishop, who transported the defendant to the police station and who was present during the booking process, testified that the defendant never inquired about whether the victim's weapon had been recovered. Furthermore, McKnight's testimony regarding the defendant's calm demeanor when he shot the victim cast doubt on the defendant's assertion that he feared that the victim was reaching for a gun as he approached the defendant. Finally, the testimony that the defendant fired one shot, paused briefly, and then fired four more shots; see footnote 5 of this opinion; three of which struck the victim in the back, also undermined the defendant's claim that he used only the amount of force necessary to repel an imminent and potentially deadly attack by the victim.

With this evidentiary background in mind, we turn to the well established legal principles that guide our analysis of the defendant's claim. With respect to the standard of review, "we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence [disproved the defendant's claim of self-defense] beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Murphy*, 254 Conn. 561, 575, 757 A.2d 1125 (2000).

The law of self-defense is equally well settled.[11] "Pursuant to § 53a-19 (a)[12] . . . a person may justifiably use

[11] We note that the defendant does not challenge the propriety of any aspect of the trial court's instructions on self-defense.

[12] See footnote 6 of this opinion for the relevant text of § 53a-19.

deadly physical force in self-defense only if he reasonably believes both that (1) his attacker is using or about to use deadly physical force against him, or is inflicting or about to inflict great bodily harm, and (2) that deadly physical force is necessary to repel such attack. . . . We repeatedly have indicated that the test a jury must apply in analyzing the second requirement, i.e., that the defendant reasonably believed that deadly force, as opposed to some lesser degree of force, was necessary to repel the victim's alleged attack, is a subjective-objective one. . . .

"The subjective-objective inquiry into the defendant's belief regarding the necessary degree of force requires that the jury make two separate affirmative determinations in order for the defendant's claim of self-defense to succeed. First, the jury must determine whether, on the basis of all of the evidence presented, the defendant in fact had believed that he had needed to use deadly physical force, as opposed to some lesser degree of force, in order to repel the victim's alleged attack. . . . The jury's initial determination, therefore, requires the jury to assess the veracity of witnesses, often including the defendant, and to determine whether the defendant's account of his belief in the necessity to use deadly force at the time of the confrontation is in fact credible. . . .

"If the jury determines that the defendant [did] not [believe] that he . . . needed to employ deadly physical force to repel the victim's attack, the jury's inquiry ends, and the defendant's self-defense claim must fail. If, however, the jury determines that the defendant in fact had believed that the use of deadly force was necessary, the jury must make a further determination as to whether that belief was reasonable, from the perspective of a reasonable person in the defendant's circumstances. . . . Thus, if a jury determines that the defendant's honest belief that he had needed to use

deadly force, instead of some lesser degree of force, was not a reasonable belief, the defendant is not entitled to the protection of § 53a-19." (Citations omitted; internal quotation marks omitted.) *State* v. *Prioleau*, 235 Conn. 274, 285–87, 664 A.2d 743 (1995).

Furthermore, under General Statutes § 53a-19 (b), a person is not justified in using deadly physical force "if he knows that he can avoid the necessity of using such force with complete safety (1) by retreating . . . ." Thus, a defendant who raises a claim of self-defense is required to retreat in lieu of using deadly physical force if the state establishes beyond a reasonable doubt that a completely safe retreat was available and that the defendant actually was aware of it. See, e.g., *State* v. *Ash*, 231 Conn. 484, 492, 651 A.2d 247 (1994).

The defendant essentially contends that, because his claim of self-defense was reasonable, the jury could not have concluded that the state disproved his claim beyond a reasonable doubt. Contrary to the defendant's contention, the relevant inquiry is not whether the jury reasonably could have found that the defendant acted in self-defense, but, rather, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty. See, e.g., *State* v. *Murphy*, supra, 254 Conn. 576. Applying this standard, we conclude that the evidence was sufficient to support the jury's finding, implicit in its verdict, that the state had disproved the defendant's claim of self-defense beyond a reasonable doubt.

First, evidence adduced by the state undermined the credibility of the defendant's assertion that he believed that the use of deadly physical force against the victim was necessary because he feared that the victim was going to shoot him. The defendant claimed that he had fired at the victim because he thought that the victim was reaching behind his back for a gun. The victim never brandished or displayed a gun on the evening of

the shooting, however, nor did he otherwise indicate that he was in possession of a gun. Indeed, no such gun was recovered. Furthermore, the defendant did not ask the police if the victim had a gun or if one had been recovered. In addition, the defendant's calm demeanor when he fired the shots that killed the victim suggests that he was not afraid that the victim was reaching for a gun. Finally, no other witness corroborated the defendant's assertion, contained in his written statement, that he saw the victim reach behind his back as he moved toward the defendant. In light of the foregoing, the jury reasonably could have rejected the defendant's contention that he believed that the victim was reaching for a gun and that he was in imminent danger of being shot.

Even if the jury found that the defendant did believe that the victim was about to use deadly force and that such force was necessary to repel the victim's attack, the evidence adduced by the state was sufficient to permit the jury to find that the defendant's subjective belief nevertheless was not objectively reasonable. Even if it is assumed that the jury credited the defendant's assertion that the victim was reaching behind his back as he approached the defendant, that fact alone is not so compelling as to require the conclusion that the defendant's belief that the victim possessed a gun was objectively reasonable. As we have explained, there was no evidence to suggest that the victim was armed. Nor was there any evidence to indicate that the victim routinely carried a weapon and, if so, that the defendant knew that. Indeed, the jury reasonably could have concluded that it was not reasonable for the defendant to have believed that the victim was reaching for a gun because it is highly likely that the victim, if armed, would have been holding the gun when he entered the kitchen to confront the defendant who, as the victim well knew, was armed.

The evidence adduced at trial also established that three of the four bullets that struck the victim entered through his back. Because the victim could not have been shot in the back while he was advancing *toward* the defendant, the jury reasonably could have inferred that the defendant should have held his fire rather than have shot all five bullets at the victim. Indeed, several witnesses testified that the first shot was followed by a slight delay and then a volley of four more shots. This evidence supported a finding that the defendant safely could have stopped firing, but elected not to do so, even though the victim no longer posed a threat because, with his back facing the defendant, he was not in a position to shoot at or otherwise injure the defendant. Consequently, the jury reasonably could have found that the defendant's actions were excessive and beyond those reasonably necessary to repel any attack. See *State* v. *Maselli*, 182 Conn. 66, 73, 437 A.2d 836 (1980) (even though defendant believed that victim was armed and aiming gun at him, jury nevertheless reasonably could have found that defendant's act of shooting victim eight times at point blank range constituted gross deviation from standard of conduct of reasonable person in same circumstances), cert. denied, 449 U.S. 1083, 101 S. Ct. 868, 66 L. Ed. 2d 807 (1981).

In addition to his contention that he shot the victim because he believed that the victim was going to shoot him, the defendant also predicated his claim of self-defense on his purported fear of being beaten to death by the victim. There is nothing in the defendant's statement, however, to substantiate his claim that he was afraid of another *physical* altercation with the victim,[13] and the record otherwise is devoid of any such proof. Moreover, although the victim was approximately six

---

[13] The letters that the defendant sent to Bruemmer; see footnote 9 of this opinion; also contained no mention of the defendant's purported fear of being beaten by the victim.

feet, two inches tall and 230 pounds, the defendant himself is approximately six feet, five inches tall and weighed about as much as the victim. Thus, the defendant was not at a physical disadvantage vis-á-vis the victim. In light of the absence of any persuasive evidence to support the defendant's contention that he was fearful that the victim was about to inflict great bodily harm, the jury was free to reject that claim of self-defense.

Furthermore, even if the jury found that the defendant actually believed that the victim was about to inflict great bodily harm upon him, the jury also could have found, in view of the dearth of evidence to support such a belief, that the defendant's concern about an imminent and severe physical beating was not objectively reasonable. Although the two men had fought moments earlier, the altercation did not last long, and it did not result in any serious injuries either to the defendant or to the victim. In fact, when the defendant had been asked if he wanted immediate medical attention after the fight, he smiled and indicated that he did not need any assistance. In the absence of any indication that the victim intended to inflict great bodily harm on the defendant, the jury reasonably could have found that any subjective belief that the defendant may have harbored regarding the victim's intent to inflict such great bodily harm was not also reasonable.

Finally, the jury reasonably could have concluded that the defendant was not entitled to prevail on his claim of self-defense because he knew that he could have retreated without jeopardizing his "complete safety . . . ." General Statutes § 53a-19 (b). McKnight testified that the defendant was standing near a door when the victim entered the kitchen. Indeed, the defendant acknowledged in his written statement that he "was going to run out the door," but decided not to out of concern for Bruemmer. The

jury was not obligated, however, to accept the defendant's justification for deciding not to leave in order to avoid any further conflict with the victim because, among other reasons, there was nothing to suggest to the defendant that Bruemmer was in any danger. Therefore, the jury reasonably could have concluded that, because the defendant knew that he could have exited the restaurant in complete safety after his physical altercation with the victim, his use of deadly physical force against the victim was not justified.[14]

For all of the foregoing reasons, the jury was not bound to accept the defendant's claim of self-defense. Contrary to his contention, therefore, the defendant was not entitled to an acquittal under § 53a-19 as a matter of law.

## II

The defendant next contends that the trial court improperly excluded expert testimony in violation of his sixth amendment right to present a defense. We disagree.

The following additional facts and procedural history are relevant to this claim. At trial, the state sought to undermine the defendant's claim of self-defense by attacking the veracity of certain key assertions that the defendant had made in his written statement to police, including his assertion that, contrary to the forensic evidence, he had shot the victim from a distance of

---

[14] The state also claims that the jury reasonably could have rejected the defendant's claim of self-defense because the evidence supported a finding that the defendant was the initial aggressor and that he did not withdraw from his encounter with the victim upon effectively communicating to the victim his intent to do so. See General Statutes § 53a-19 (c). We do not reach this contention in light of the other reasons, which we set forth in the text of this opinion, why the jury properly could have rejected the defendant's claim of self-defense.

fifteen to twenty feet.[15] The state also relied on a video-
tape of the defendant that had been taken at the police
station subsequent to his arrest. On that videotape, the
defendant asserted, among other things, that he had
spent four years in the United States Marine Corps
during which he achieved the rank of lieutenant and
was an instructor in marksmanship. At trial, however,
the state introduced evidence establishing that the
defendant, in fact, had spent only two months in the
Marine Corps before being discharged from boot camp.

The defendant thereafter sought to introduce the tes-
timony of Arthur Taub, a neurologist and neuroscien-
tist,[16] to explain, inter alia, that the inaccuracies in the
defendant's assertions regarding the extent of his ser-
vice in the Marine Corps and his distance from the
victim immediately before he shot him likely were due
to certain head injuries that the defendant had sustained
during his altercation with the victim. Outside the pres-
ence of the jury, Taub testified that he had reviewed
photographs of the defendant taken after the shooting,
as well as the videotape of the defendant taken at the
police station.[17] Taub further testified that, on the basis
of the defendant's head and facial injuries as depicted
in the photographs and on the basis of the defendant's
behavior as depicted in the videotape, the defendant

---

[15] As we previously have indicated; see part I of this opinion; forensic
evidence introduced by the state established that the defendant was only
two to three feet from the victim when the defendant shot him.

[16] A neurologist is a physician who specializes in the diagnosis and treat-
ment of diseases of the nervous system, including the brain. See Merriam-
Webster's Collegiate Dictionary (11th Ed. 2003) p. 833. A neuroscientist is
a scientist who studies the function of the nervous system. See id., p. 834.
In addition to a doctorate degree in medicine, Taub also has a PhD in neuro-
science.

[17] In preparing his testimony, Taub also reviewed the defendant's state-
ment to police, police reports, the testimony of various police officers, the
statements and testimony of a number of eyewitnesses, a "criminalistics"
report, the autopsy report and the forensic pathologist's testimony. Taub
never interviewed or personally examined the defendant, however.

likely had suffered a concussion as a result of his alter-cation with the victim.

Taub also testified that a concussion can result in memory loss. Taub explained that a person who suffers a concussion and concomitant memory loss may "con-fabulate" or create a story to replace the missing mem-ory. According to Taub, a person who engages in such post-traumatic confabulation is not lying; rather, he actually believes that his recollection of the events is accurate.[18]

On the basis of Taub's review of the videotape, Taub testified that the defendant had exhibited signs of con-fabulation, hyperemotionality and volubility following his arrest. According to Taub, these manifestations were suggestive of an injury consistent with a concus-sion. In particular, Taub testified that the defendant's claims regarding the extent of his involvement in the Marine Corps constituted a "striking" example of post-traumatic confabulation. Taub also testified that the concussion that the defendant purportedly sustained

---

[18] Taub explained the defendant's statements about his Marine Corps expe-rience as follows: "[T]hat sort of statement, which can be checked [for accuracy] almost instantaneously, and being grossly incorrect, is, to me, an example of confabulation. And what happens is that individuals who have been injured, not understanding . . . precise[ly] . . . what has [transpired] before[hand], try to make sense of it, and use various kinds of schemes or programs that they already have which may be unrelated entirely to what is going on, and simply say it. And you see this in the hospital all the time. I mean, you will interview people and you will ask them, Did I see you in the bar last night? And, at first, they will not be clear. And then they will develop an entire story and build that story around a little kernel of some sort of memory or scheme that they have. And, to me, [the defendant's exaggeration of the nature of his involvement in the Marine Corps] was a striking example . . . of post-traumatic confabulation." Another expert witness in an unrelated case described confabulation as "a mental defect where[by] someone who has a poor or missing memory thinks that they have a memory and will tell you what happened when it didn't. . . . It is a false memory. It is not a lie. It is a belief the patient has which simply has no basis in fact." (Internal quotation marks omitted.) State v. Kaddah, 250 Conn. 563, 571–72, 736 A.2d 902 (1999).

likely caused the defendant's misperception regarding the actual distance between him and the victim when he shot the victim.

At the conclusion of Taub's voir dire testimony, defense counsel stated that she also intended to elicit testimony from Taub regarding the cognitive difficulties that the defendant had experienced following the altercation with the victim. Defense counsel further stated that Taub "would also testify to some of the discrepancies in the case that arise from the allegations by the state with respect to the [defendant's written] statement . . . [a]s well as [to] remarks that [were] made [by the defendant] on the videotape . . . [including those with respect to] distance, timing, that type of thing." Finally, defense counsel reiterated that the state had "opened the door [to such testimony] by putting in issue the question of whether . . . the remarks on the tape and the remarks [contained in] the statement are truthful or are false."

After hearing Taub's voir dire testimony and defense counsel's proposed supplemental proffer, the court concluded that Taub indeed was qualified as an expert in the fields of neurology and head injuries and that his knowledge in those areas was beyond that of the average juror. The court nevertheless initially denied defense counsel's request for permission to call Taub as a witness.[19] The court noted that Taub's testimony likely would mislead and confuse the jury.

Thereafter, the court reconsidered its ruling and permitted Taub to testify about the effect of the defendant's

---

[19] We note that the assistant state's attorney did not object to defense counsel's use of Taub's testimony insofar at it related to the defendant's memory and to his ability to perceive and recall distances. The state did object, however, to testimony by Taub concerning the effect of the defendant's injuries on his general cognitive abilities. In particular, the state claimed that such testimony necessarily would be speculative in view of the fact that Taub never had examined or interviewed the victim personally, either immediately following the shooting or at any time thereafter.

purported concussion on his ability to perceive distances accurately. The court nevertheless limited the substance of Taub's testimony to the foregoing issue and, thus, prohibited Taub from testifying about the effect of the concussion on the defendant's memory and cognitive abilities in general. Accordingly, Taub thereafter testified in the presence of the jury that the defendant had "suffered, at the least, a mild concussion," and that such an injury "would [have] significantly interfere[d] with" the defendant's ability to determine distances accurately and with his "ability to recall whether or not [he] had made such a distinction earlier."

Before addressing the merits of the defendant's claim, we review the legal principles that govern our review. "The federal constitution require[s] that criminal defendants be afforded a meaningful opportunity to present a complete defense. . . . The sixth amendment . . . [guarantees] the right to offer the testimony of witnesses, and to compel their attendance, if necessary, [and] is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so that it may decide where the truth lies."[20] (Citation omitted; internal quotation marks omitted.) *State* v. *Cerreta*, 260 Conn. 251, 260–61, 796 A.2d 1176 (2002).

"A defendant is, however, bound by the rules of evidence in presenting a defense. . . . Although exclusionary rules of evidence cannot be applied mechanistically to deprive a defendant of his rights, the constitution does not require that a defendant be permitted to present every piece of evidence he

---

[20] "The right to compulsory process is fundamental to due process of law and is applied to state prosecutions through the due process clause of the fourteenth amendment. *Washington* v. *Texas*, 388 U.S. 14, 18–19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967)." *State* v. *Cerreta*, 260 Conn. 251, 261 n.8, 796 A.2d 1176 (2002).

wishes." (Internal quotation marks omitted.) *State* v. *Dehaney*, 261 Conn. 336, 366, 803 A.2d 267 (2002), cert. denied, 537 U.S. 1217, 123 S. Ct. 1318, 154 L. Ed. 2d 1070 (2003). Thus, a defendant's right to present a defense is not violated when a trial court properly excludes expert testimony pursuant to the applicable rules of evidence. See, e.g., *State* v. *Billie*, 250 Conn. 172, 181–82, 738 A.2d 586 (1999). "Expert testimony should be admitted [however] when: (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues." (Internal quotation marks omitted.) *State* v. *Vega*, 259 Conn. 374, 392, 788 A.2d 1221, cert. denied, 537 U.S. 836, 123 S. Ct. 152, 154 L. Ed. 2d 56 (2002); see also Conn. Code Evid. § 7-2.

"[Of course, a predicate to the admissibility of such testimony is its relevance to some issue in the case.] Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . Evidence is irrelevant or too remote if there is such a want of open and visible connection between the evidentiary and principal facts that, all things considered, the former is not worthy or safe to be admitted in the proof of the latter." (Internal quotation marks omitted.) *State* v. *Wargo*, 255 Conn. 113, 123–24, 763 A.2d 1 (2000); see also Conn. Code Evid. § 4-1. We now turn to the defendant's claim.

The defendant contends that the testimony that he was barred from eliciting from Taub was crucial to the jury's assessment of the credibility of his claim of self-defense and, therefore, the court's exclusion of that evidence violated his constitutional right to present a defense. In particular, the defendant contends that,

although the trial court permitted Taub to testify both that the defendant had suffered a concussion and that that concussion had affected his ability to perceive distances, the court improperly prohibited Taub from testifying about the "effects of the concussion on [the defendant's] other perceptions" and "on his ability to accurately recall what [had] happened in the kitchen . . . ." The defendant also claims that he was entitled to have Taub explain to the jury that the defendant's false statements about his service in the Marine Corps were the product of post-traumatic confabulation stemming from the head injuries that he had sustained during his fight with the victim.[21] We reject the defendant's claims.

With respect to the defendant's first contention, we conclude that it was not adequately preserved at trial and that it has not been briefed adequately on appeal. With the exception of two statements by the defendant, namely, the assertion contained in his written statement regarding his distance from the victim when he shot him, and his assertion, as depicted on the videotape,

---

[21] On appeal, the defendant also claims that Taub would have testified regarding the "neurological effects of life-threatening stress, separate from the effects of the concussion . . . ." The state contends that the defendant failed to raise this claim in the trial court and, therefore, we should not consider it. See Practice Book § 60-5. The defendant counters that the claim adequately was preserved by virtue of defense counsel's statement, made in connection with her offer of proof relating to Taub's testimony, that Taub would testify about "some of the physiological changes in the body, the things that actually happen in the body [following a blow to the head], the [endocrinological] changes, [the defendant's] physiological changes. [Taub] would also testify as to the repetitive body functions and its association and relationship to head injur[ies]." We agree with the state that defense counsel's statements in this regard were not sufficiently clear and specific to alert the court that defense counsel intended to elicit testimony from Taub regarding the likely effect of stress on the defendant. Because the defendant failed to identify the purpose of the proffered evidence adequately so that the court could determine its admissibility, we decline to review the defendant's claim. See, e.g., *Burns* v. *Hanson*, 249 Conn. 809, 824, 734 A.2d 964 (1999).

regarding the extent of his service in the Marine Corps, the defendant failed to inform the trial court how Taub's testimony related to any other of his postarrest assertions or to his conduct after his fight with the victim. On appeal, the defendant likewise has failed to identify any such statement or conduct that resulted from or was affected by his purported cognitive impairment and loss of memory. Indeed, other than the defendant's assertions regarding the distance from which he shot the victim and his service in the Marine Corps, most, if not all, of the defendant's postarrest statements were consistent with his self-defense claim, and defense counsel relied on those statements in advocating that claim during her closing argument to the jury.

With respect to the trial court's ruling barring Taub's testimony rationalizing the defendant's grandiose statements about his Marine Corps service as a product of post-traumatic confabulation, we are not persuaded that the exclusion of that evidence violated the defendant's constitutional right to present a defense. Even if we assume, arguendo, that the court improperly excluded that testimony, we still must determine whether the impropriety rises to the level of a constitutional violation. E.g., *State* v. *Sandoval*, 263 Conn. 524, 546, 821 A.2d 247 (2003). "Whether a trial court's erroneous restriction of a defendant's or defense [witness'] testimony in a criminal trial deprives a defendant of his [constitutional] right to present a defense is a question that must be resolved on a case by case basis. . . . The primary consideration in determining whether a trial court's ruling violated a defendant's right to present a defense is the centrality of the excluded evidence to the claim or claims raised by the defendant at trial." (Citation omitted; internal quotation marks omitted.) Id.

In the present case, the defendant's theory of defense was justification. Thus, defense counsel sought to elicit Taub's testimony about confabulation to rebut the

state's claim that the defendant's false statements regarding his military experience undermined the credibility of his claim of self-defense. We conclude that the defendant's postarrest exaggeration of his Marine Corps experience was not central to his defense. The defendant's military service was wholly unrelated to the only disputed issue in the case, namely, whether the defendant had shot the victim in self-defense. It is true, of course, that the jury's resolution of that issue depended, to some extent, on its assessment of the credibility of the defendant's written statement. The primary measuring stick for the jury, however, was not whether the defendant had exaggerated the nature and extent of his military service, but, rather, whether the defendant's version of the facts as set forth in his written statement was believable in light of the contradictory evidence adduced by the state. Moreover, although Taub's testimony was limited to the defendant's perception and short-term memory of distances, the jury was apprised that, in Taub's view, the defendant had suffered a concussion that significantly had impaired his cognitive ability and his ability to recall. Consequently, we are not persuaded that the trial court's ruling barring Taub's testimony regarding the defendant's purported confabulation, even if improper, rises to the level of a constitutional violation.

In light of our conclusion that any impropriety in the exclusion of such testimony was not of constitutional dimension, the defendant nevertheless is entitled to reversal of his conviction if he can establish that the exclusion was both improper and harmful. See, e.g., *State* v. *Young*, 258 Conn. 79, 94–95, 779 A.2d 112 (2001). "As we recently have noted, we have not been fully consistent in our articulation of the standard for establishing harm. . . . One line of cases states that the defendant must establish that it is more probable than not that the erroneous action of the court affected the

result. . . . A second line of cases indicates that the defendant must show that the prejudice resulting from the impropriety was so substantial as to undermine confidence in the fairness of the verdict." (Citations omitted; internal quotation marks omitted.) Id., 95. For purposes of the present case, we need not choose between the two formulations because, even if we assume that the trial court improperly limited Taub's testimony, we conclude that the defendant has not satisfied his burden of proving harm under either formulation.

As we have explained, the defendant's false statements about his military service related only to the defendant's overall credibility and, consequently, those statements bore only tangentially on the defendant's claim of self-defense. In addition, the jury had considerable evidence before it that related directly to the issue of whether the defendant had shot and killed the victim in self-defense, or whether, as the state maintained, the use of deadly force was unnecessary. Finally, the excluded testimony would have had little or no impact on the strength and credibility of the state's case, which included forensic evidence that the defendant had shot the victim three times in the back. We conclude, therefore, that the defendant has failed to demonstrate that the exclusion of Taub's testimony regarding the defendant's purported confabulation of the extent of his service in the Marine Corps was harmful.[22]

---

[22] The defendant also contends that Taub would have testified about the defendant's allegedly hyperemotional behavior and volubility as depicted on the videotape. The defendant has failed to explain, however, why such testimony was relevant or how its exclusion, if improper, harmed him. In the absence of any such explanation, the defendant cannot prevail on his claim.

## III

The defendant finally contends that constitutional principles of double jeopardy[23] barred his retrial. We disagree.

Certain additional facts and procedural history are relevant to this issue. The defendant initially was tried for murder in 1999 (first trial). Following the presentation of evidence in the first trial, the court, *Moraghan, J.*, instructed the jury on the law. In the course of its charge, the court instructed the jury on the lesser included offenses of manslaughter in the first degree with a firearm and criminally negligent homicide. In accordance with our decision in *State* v. *Sawyer*, 227 Conn. 566, 630 A.2d 1064 (1993),[24] the trial court also informed the jury that it could consider a lesser included offense only after first finding the defendant not guilty of the greater offense.[25] On February 15, 2000, the case was submitted to the jury.

---

[23] The fifth amendment to the United States constitution provides in relevant part: "No person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb . . . ." The double jeopardy clause of the fifth amendment is applicable to the states through the due process clause of the fourteenth amendment. *Benton* v. *Maryland*, 395 U.S. 784, 794, 89 S. Ct. 2056, 23 L. Ed. 2d 707 (1969).

[24] In *State* v. *Sawyer*, supra, 227 Conn. 579, we held that, to ensure that the greater offense has been determined by unanimous agreement, the court is required to instruct the jury to reach a unanimous decision on the issue of guilt or innocence with respect to that greater offense before considering any lesser included offense.

[25] In elaborating on the proper sequence in which the jury was to consider the defendant's culpability for murder and the lesser included offenses, the court, *Moraghan, J.*, instructed the jury in relevant part: "So, there are three possible charges that you can consider. The first is murder. And if you find the defendant guilty of murder, you'll go no farther . . . . If you find he is not guilty of murder, then you will consider manslaughter in the first degree with a firearm. . . . If you find him not guilty of that, then you go under criminally negligent homicide. But if you find murder, you'll stop there. . . . If you don't find it, you'll consider manslaughter in the first degree and if you find manslaughter in the first degree, you'll stop there. If you don't find manslaughter in the first degree with a firearm, obviously, it has to be with a firearm in this case, then you go to criminally negligent homicide."

On February 16, 2000, the court received a note from the jury inquiring as to whether it would be permissible to consider a lesser included offense even though there was no unanimous agreement on the greater charge, namely, murder.[26] The trial court responded that the jury could not consider a lesser included offense unless and until all of the jurors have reached a verdict of not guilty on the greater offense. Thereafter, the jury requested that the court repeat its instructions on manslaughter.

On February 18, 2000, the jury asked for clarification regarding the element of intent.[27] Later that same day, the jury sent out two more "questions":[28] (1) "The jurors are not following instructions, we're deadlocked"; and (2) "We're deadlocked." The trial court apprised the jury that it was required to follow the court's instructions and indicated that the jury would be excused for the day. Before leaving for the day, however, the jury sent out yet another note stating that a "a final vote" had been taken and that the jurors were "hopelessly deadlocked." The court then excused the jury until February 22, 2000. Immediately thereafter, defense counsel requested, in accordance with a written motion filed with the court, that, if the jurors remained deadlocked, the court poll the jurors on whether any partial verdict had been reached.

On February 22, 2000, the court admonished the jury that it was bound to follow the court's instructions on the law. The trial court also gave the jury a "Chip Smith"

---

[26] In the first trial, the court received a total of twenty-seven notes from the jury during the course of jury deliberations. We refer only to those notes that are relevant to the defendant's double jeopardy claim, however.

[27] The jury also asked whether there is a distinction between intent and premeditation.

[28] The court characterized them as questions even though they were of an assertive nature.

charge.[29] That same day, the jurors informed the court by note: "The majority of the jurors believe one way on the charge of murder [and] a minority of the jurors believe otherwise. We understand your instructions. We . . . agree that unanimity is not going to be achieved." The trial court instructed the jurors to return to their deliberations and to attempt to "reach some other result rather than an impasse." A juror subsequently requested to be excused from service. After consulting with counsel, and without objection, the trial court denied the juror's request.

On February 23, 2000, defense counsel moved for a mistrial, claiming that the various notes from the jury indicated that the jurors were deadlocked and that they would not be able to reach a unanimous verdict. The defendant also noted that the deliberations apparently were taking a toll on at least one juror. The state objected to the defendant's motion, noting that the jury actually had been deliberating for only a relatively short period of time. The trial court denied defense counsel's motion.

On February 25, 2000, the court received a note from a single, unidentified juror stating, "We're still not reaching agreement. I and several others feel we will not reach a unanimous decision. I am asking to be released [from] this task." The trial court denied the request and reminded the jurors of their "oath to reach a verdict or a result, whichever the case may be," adding, apparently for emphasis, that "that will happen." The trial court further stated that "[n]o one is going to be released from this jury. Don't ask again. Don't mention it again

---

[29] "A Chip Smith instruction reminds the jurors that they must act unanimously, while also encouraging a deadlocked jury to reach unanimity. See *State* v. *Smith*, 49 Conn. 376 (1881); see also 5 Connecticut Practice, D. Borden & L. Orland, Connecticut Criminal Jury Instructions (1986) § 4.8." (Internal quotation marks omitted.) *State* v. *Pare*, 253 Conn. 611, 616 n.4, 755 A.2d 180 (2000).

because it is not going to happen." Defense counsel renewed his motion for a mistrial on the ground that the jury was deadlocked. Although the trial court did not expressly address the defendant's renewed motion for a mistrial, the court instructed the jury to resume its deliberations, thereby effectively denying defense counsel's renewed motion.

On February 28, 2000, the defendant filed a written motion for a mistrial. In his motion, the defendant claimed that the court's admonition to the jury that it was "to reach a verdict or a result," along with the court's comment that "[n]o one is going to be released from this jury," was coercive and created an unreasonable risk of depriving him of a fair trial. Additionally, the defendant stressed that the jury was deadlocked. The next day, February 29, 2000, the trial court entertained argument on the defendant's motion. Defense counsel contended that an "immediate mistrial" should be declared because the jury was deadlocked and because the court's remarks to the jury on the previous day were unduly coercive. The trial court denied the defendant's motion.

Later that day, the jury had yet another note delivered to the court. The note stated: "Your Honor, we've deliberated in earnest. We cannot come up with a unanimous verdict." Upon receipt of this note, the following colloquy occurred between counsel and the court:

"The Court: . . . At this point, it appears as though [the jury has] gone as far as [it] can go. We're not going to get a verdict. Do you want to be heard?

"[Defense Counsel]: I would just ask that if [the jurors] are unanimous on any count, such as the greater count of murder—

"[Assistant State's Attorney]: I would ask that they be given the Chip Smith charge, which the state submitted to the court, the second one.

"[Defense Counsel]: I would object to that, they've been—

"The Court: Well, as far as they can't agree [as] to any decision in any particular verdict, they can't. If they can't agree on murder, they don't go any further. If they can't agree on manslaughter, they don't go any further. It's not up to me to probe [as] to where they are. They can't agree. That's all there is to it. Bring them out please.

"It appears as though we have no choice but to declare a mistrial, unfortunately. Do you want to be heard on that, either one of you?

"[Defense Counsel]: No, Your Honor.

\* \* \*

"[Assistant State's Attorney]: [I've already] spoken my piece on that, Your Honor."

The trial court then declared a mistrial and dismissed the jurors.

On March 2, 2000, the defendant filed a motion for judgment of acquittal on the murder charge. In support of the motion, the defendant claimed, inter alia, that he had become aware that the jury unanimously had agreed that he was not guilty of murder and merely had deadlocked on the charge of manslaughter in the first degree with a firearm. According to the defendant, therefore, constitutional principles of double jeopardy barred his subsequent retrial for murder. Defense counsel also averred at the hearing on the defendant's motion that the jury foreperson was prepared to testify that the jury had "taken a vote on the murder count and had found the defendant not guilty of murder." The trial court declined to receive testimony from the foreperson and denied the defendant's motion.

On August 1, 2000, the defendant filed an amended motion to dismiss the charge of murder.[30] The defendant claimed that the trial court had declared a mistrial without the requisite " 'manifest necessity' . . . ."[31] The defendant asserted that the trial court had neglected to consider all reasonable alternatives to a mistrial by virtue of its failure to poll the jury as requested. The defendant further claimed that the jury had acquitted him of the murder charge and, therefore, any subsequent retrial on that charge would violate his rights under the double jeopardy clause of the fifth amendment. The defendant also alleged that the jury had deadlocked on the charge of manslaughter with a firearm. The trial court, *Moraghan, J.*, concluded that the defendant had "acquiesced in the declaration of a mistrial" and, consequently, a finding of manifest necessity for the declaration of a mistrial was not necessary. Accordingly, on October 11, 2000, the trial court denied the defendant's amended motion to dismiss.

The next day, October 12, 2000, the state filed a substitute information charging the defendant only with the crime of manslaughter in the first degree with a firearm. The defendant filed no further motions to dismiss. The defendant subsequently was tried (second trial) and found guilty of that charge. Prior to sentencing, the defendant filed a motion in arrest of judgment, claiming, inter alia, that he was tried a second time in violation of his rights under the double jeopardy clause of the

---

[30] The defendant had filed an earlier motion to dismiss the murder charge, on grounds of double jeopardy, on March 10, 2000. On March 28, 2000, the court reserved decision on that motion until immediately prior to the defendant's retrial. The defendant appealed the court's refusal to entertain his motion to dismiss until that later date. This court granted the state's motion to dismiss that appeal on July 13, 2000.

[31] "[A] judge may declare a mistrial without the defendant's consent only if there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated." (Internal quotation marks omitted.) *State* v. *Tate*, 256 Conn. 262, 286, 773 A.2d 308 (2001).

fifth amendment because the court, *Moraghan, J.*, had declared a mistrial in the first trial without a finding of manifest necessity. The trial court, *Holden, J.*, denied the motion, effectively concluding that the defendant had waived his double jeopardy claim by failing to challenge the substitute information prior to the conclusion of the second trial. The court, *Holden, J.*, thereafter rendered judgment in accordance with the jury verdict. With this background in mind, we turn to the relevant legal principles.

"The Double Jeopardy Clause of the Fifth Amendment protects a criminal defendant from repeated prosecutions for the same offense. . . . As a part of this protection against multiple prosecutions, the Double Jeopardy Clause affords a criminal defendant a valued right to have his trial completed by a particular tribunal." (Internal quotation marks omitted.) *State* v. *Butler*, 262 Conn. 167, 174, 810 A.2d 791 (2002). Thus, when a defendant objects to the declaration of a mistrial and is unwilling to forgo his right to have the charges against him resolved by that particular tribunal, it is well settled that the court may declare a mistrial "only if there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated." (Internal quotation marks omitted.) *State* v. *Tate*, 256 Conn. 262, 286, 773 A.2d 308 (2001). The requirement of manifest necessity ensures that a defendant's deprivation of his right to have the charges against him decided by that tribunal is subject to "the exercise of scrupulous judicial discretion." *State* v. *Aillon*, 182 Conn. 124, 129, 438 A.2d 30 (1980), cert. denied, 449 U.S. 1090, 101 S. Ct. 883, 66 L. Ed. 2d 817 (1981).

When the defendant consents to the declaration of a mistrial, however, there generally is no double jeopardy

bar to a retrial;[32] see *State* v. *Butler*, supra, 262 Conn. 174–75 ("[o]rdinarily, the prohibition against double jeopardy does not apply whe[n] a defendant has requested that a mistrial be declared"); *State* v. *Kasprzyk*, 255 Conn. 186, 205 n.19, 763 A.2d 655 (2001) ("[i]t is well established that whe[n] the defendant moves for, or consents to a mistrial, the defendant is prevented from raising a double jeopardy claim"); because a defendant, having consented to a mistrial, "is deemed to have deliberately elected to for[go] his valued right to have his guilt or innocence determined before the first trier of fact." (Internal quotation marks omitted.) *Aillon* v. *Manson*, 201 Conn. 675, 681, 519 A.2d 35 (1986). Consequently, because a defendant who consents to a mistrial is deemed to have waived that right, "no finding of manifest necessity for the declaration need be made." *State* v. *Aillon*, supra, 182 Conn. 129.

Relying primarily on this court's holding in *State* v. *Tate*, supra, 256 Conn. 262, the defendant claims that the second trial violated the double jeopardy clause because the trial court, *Moraghan, J.*, declared a mistrial without the requisite manifest necessity. In *Tate*, we held that a manifest necessity did not exist for the trial court's declaration of a mistrial without the consent of the defendant, James Tate. Id., 286–87. We concluded that because the trial court declined to poll the jury in accordance with Tate's request, it failed to explore all reasonable alternatives to the declaration of a mistrial. Id., 287. In the present case, we conclude that, because the defendant consented to the declaration of a mistrial,

---

[32] We note that there is an exception to this general rule when "prosecutorial or judicial overreaching is designed to provoke the defendant into asking for a mistrial, thereby avoiding an acquittal or affording the state another, perhaps more favorable, opportunity to convict . . . ." (Internal quotation marks omitted.) *State* v. *Butler*, supra, 262 Conn. 176. In the present case, the defendant does not claim that either the trial court or the assistant state's attorney improperly goaded him into seeking a mistrial. Accordingly, this exception to the general rule is inapplicable.

he cannot prevail on his claim that his second trial was barred by the double jeopardy clause.[33]

It is clear from the record that the defendant did not expressly object to the trial court's declaration of the mistrial. Therefore, the determinative issue is whether the defendant may be deemed to have consented to the trial court's declaration of the mistrial. Consent is to be determined from the totality of circumstances surrounding the declaration of the mistrial. See *State* v. *Kasprzyk*, supra, 255 Conn. 205 n.19 ("[c]ourts examine the totality of the circumstances surrounding the trial court's [declaration] of a mistrial to determine whether a defendant either expressly or impliedly consented to the mistrial"). On the basis of the totality of the circumstances, we conclude that the defendant consented to the trial court's declaration of the mistrial.

Although the defendant did not consent explicitly to the mistrial, he expressed no disagreement when the trial court indicated that the jury appeared to be unable to reach a verdict. In addition, after the trial court had made its intention to declare a mistrial clear and invited comment from both defense counsel and the assistant state's attorney, defense counsel raised no objection, indicating that he had nothing more to say on the matter. E.g., *United States* v. *Gantley*, 172 F.3d 422, 429 (6th Cir. 1999) (fact that defendant was "essentially invited" to offer objection and failed to do so weighs in favor of finding of consent); *United States* v. *Buljubasic*, 808 F.2d 1260, 1265–66 (7th Cir.) (invitation to object and

---

[33] The state contends that the defendant waived any double jeopardy claim he may have had regarding the manslaughter charge by failing to seek dismissal of that charge prior to the commencement of the second trial. The defendant contends that he did not waive his claim because he sought dismissal of the charge before the court had rendered judgment in accordance with the jury verdict of guilty. We need not reach this claim in light of our conclusion that the defendant consented to the trial court's declaration of the mistrial.

subsequent failure to do so weigh in favor of finding of assent to declaration of mistrial), cert. denied, 484 U.S. 815, 108 S. Ct. 67, 98 L. Ed. 2d 31 (1987). Furthermore, the record is devoid of any suggestion that defense counsel had failed to object because he was surprised by the trial court's ruling. See *United States* v. *DiPietro*, 936 F.2d 6, 11 (1st Cir. 1991) (in determining whether defendant consented to mistrial, court should consider whether defendant could have anticipated mistrial or, instead, was surprised by ruling). Indeed, in light of the defendant's own requests for a mistrial, it is clear that he was aware that a mistrial might be declared. Moreover, defense counsel had adequate time to reflect on the trial court's intention to declare a mistrial and to formulate an appropriate objection if he wished to do so. See *United States* v. *Palmer*, 122 F.3d 215, 219 (5th Cir. 1997) (factor to be considered in determining whether defendant consented to mistrial is whether defendant was afforded meaningful opportunity to respond to trial court's ruling); *United States* v. *Goldstein*, 479 F.2d 1061, 1066 (2d Cir.) (same), cert. denied, 414 U.S. 873, 94 S. Ct. 151, 38 L. Ed. 2d 113 (1973).

Furthermore, the defendant himself repeatedly had moved for a mistrial. Each such occasion constituted an acknowledgment by the defendant that he believed that a mistrial was warranted and that he was prepared to relinquish his right to have the charges against him resolved in the first trial. In fact, on the very same day that the mistrial was declared, the defendant himself had sought an "immediate mistrial" on the ground that any verdict would be the product of judicial coercion, and there is no indication in the record that the defendant had retreated from this position.[34] See *United*

---

[34] Contrary to the defendant's claim, the fact that his motion for a mistrial was predicated on a claim of judicial coercion rather than juror deadlock does not militate against the conclusion that his motion was indicative of his consent to a mistrial. See *State* v. *Knight*, 616 S.W.2d 593, 596–97 (Tenn.) (fact that defendant's motion for mistrial was based on different ground

*States* v. *Goldstein,* supra, 479 F.2d 1067 (that defendant previously moved for mistrial weighed in favor of finding of consent even though defendant's motion had been denied and record contained indication that defendant had changed his mind); cf. *United States* v. *Buljubasic,* supra, 808 F.2d 1265 (factor to consider is whether defendant indicates that he or she no longer sought mistrial).

The only fact that weighs in the defendant's favor is defense counsel's request that the jurors be polled to determine whether they had reached a partial verdict. This request was not accompanied by an objection to the declaration of a mistrial, however. Furthermore, once the trial court denied the defendant's request to poll the jurors and clearly indicated that it intended to declare a mistrial, the defendant did not object even though the trial court invited defense counsel to register any objection he may have had to the declaration of a mistrial. Thus, the record does not substantiate the defendant's claim that the court's failure to poll the jury necessarily vitiated his consent to the mistrial.

Finally, and importantly, the defendant himself had sought a mistrial on the ground that the jury had reached a verdict of not guilty *on the murder charge.* At no time did the defendant claim that the jury had reached such a verdict on the charge of manslaughter in the first degree with a firearm. In fact, the defendant represented, in connection with his amended motion to dismiss, which he filed after the declaration of the mistrial but before the second trial had commenced, that he had learned that the jury unanimously had found him not guilty of murder *and had deadlocked on the lesser charge of manslaughter in the first degree with a fire-*

than that relied on by court in declaring mistrial was irrelevant to issue of whether defendant consented to mistrial inasmuch as defendant's motion reflected willingness to give up right to have case decided by jury already impaneled), cert. denied, 454 U.S. 1097, 102 S. Ct. 670, 70 L. Ed. 2d 638 (1981).

*arm.* The defendant's acknowledgment that the jury had deadlocked on the manslaughter charge necessarily constituted a concession that the jury had not reached a verdict on that charge. In such circumstances, the court's failure to poll the jury on the charge of manslaughter in the first degree with a firearm could not have harmed the defendant and, in view of his own requests for a mistrial, there is no reason to believe that the defendant did not consent to the trial court's declaration of the mistrial.

In light of the foregoing, the defendant's only viable double jeopardy claim arises out of the court's failure to poll the jury in regard to the murder charge. The state, however, in the exercise of its discretion, elected not to retry the defendant for murder, thereby rendering moot any double jeopardy challenge to his retrial on that charge. Consequently, in light of this fact and the fact that the defendant consented to the trial court's declaration of the mistrial, he has no legitimate claim that he was prejudiced by the court's failure to poll the jury before declaring the mistrial.

The judgment is affirmed.

In this opinion the other justices concurred.