******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* LAWRENCE
R. ANDREWS
(SC 18913)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald,
Espinosa and Robinson, Js.

*Argued February 18—officially released August 26, 2014*

*James B. Streeto*, assistant public defender, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attorney, and *Terence D. Mariani*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ZARELLA, J. The defendant, Lawrence R. Andrews, appeals from the judgment of conviction, rendered after a jury trial, of one count of felony murder in violation of General Statutes § 53a-54c.[1] The defendant claims that (1) the trial court improperly precluded the testimony of a key defense witness, (2) he was deprived of his due process right to a fair trial by a pattern of prosecutorial impropriety, (3) his conviction was fundamentally unfair because the state relied on a different theory in his case than in the case against a coassailant, (4) the evidence was insufficient to support his conviction for felony murder, and (5) the trial court improperly denied his motion to suppress his oral and written statements to the police confessing his role in the murder. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On March 21, 1999, a tenant at 17 Burton Street in the city of Waterbury went to the basement to retrieve his bicycle and discovered the partially clothed body of the victim, Michelle McMaster, lying on the floor. A police investigation subsequently determined that the cause of her death was asphyxia by manual strangulation and that the evidence also was consistent with a sexual assault.

For nearly one decade, the police were unable to solve the crime. In 2008 and 2009, however, a purported eyewitness, Donna Russell, was interviewed on several occasions by detectives from the Waterbury Police Department and gave three increasingly detailed written statements regarding what she had seen. In her statements, Russell disclosed that, on the evening of March 20, 1999, she went to the basement of 17 Burton Street, a local drug hangout, for the purpose of using heroin. Upon her arrival, four other people already were there: the defendant, Barry Smith, a man she did not know but who later was identified from a photographic array as Orenthain Daniel, and the victim. As Russell proceeded to inject herself with heroin, she heard the defendant and the victim arguing about money or drugs. The argument quickly escalated, and a struggle ensued, during which the victim was knocked down. Afraid that something "horrible" was about to happen, Russell decided to flee. The last thing she saw upon escaping from the basement was the defendant bending over the victim and choking her, Smith holding down her arms, and Daniel pulling down her pants. She also heard the victim gasping for air and pleading for Russell's help, and the men saying they were going to have sex with her one way or another.

The defendant was arrested on March 6, 2009, and ultimately charged with murder and felony murder based on the predicate felony of attempted robbery.[2] On May 2, 2011, the defendant entered a plea of not

guilty and elected a jury trial. At trial, the court denied the defendant's motions for judgment of acquittal after the state and the defense, respectively, rested their cases. On June 14, 2011, the jury returned a verdict of not guilty as to the count of murder and guilty as to the count of felony murder, and the court subsequently sentenced the defendant to a term of thirty-five years incarceration. This appeal followed.

I

The defendant first claims that the trial court's decision to preclude testimony from a key defense witness violated the defendant's constitutional right to present a defense under the sixth amendment to the United States constitution[3] because the witness would have established that the defendant had sufficient money to buy drugs and thus lacked a motive to commit the attempted robbery, the predicate offense for the felony murder charge. The defendant further claims that the testimony of the witness "would have provided vital corroboration for his version of events, severely undercut the state's theory, and bolstered the defendant's defense and his own testimony." The state responds that the trial court properly excluded the testimony as irrelevant because it did not try the case on the theory that the defendant was motivated to rob the victim due to a lack of money. Rather, it tried the case on the theory that the defendant wanted to have some or all of the victim's crack cocaine to satisfy his immediate craving for drugs. The state also argues that the testimony was irrelevant because it would not have established that the defendant had any of his purported money with him on the night of the murder. The state finally argues that, even if the trial court committed evidentiary error, the error was not harmful. We agree with the state that the trial court's ruling to preclude the testimony was not improper.[4]

The following additional facts are relevant to our resolution of this claim. Upon completion of the state's case-in-chief, during which Russell testified that the defendant had money whenever she was around him, defense counsel informed the court that he intended to call the defendant and his sister, Tricia Andrews (Andrews), as the only two defense witnesses. The senior assistant state's attorney (prosecutor) responded with an oral motion in limine seeking an offer of proof as to Andrews' proposed testimony. In reply to the motion, defense counsel represented that Andrews would testify that the defendant had no motive to commit the attempted robbery because he had received a large sum of money the previous year from his mother's estate. The prosecutor, however, objected on relevancy grounds, arguing that it was "not the state's position that [the] crime was motivated by a lack of access to funds. It's the state's position that this crime was motivated by [the defendant's] intense and long-stand-

ing desires to get crack cocaine any way he could when he wanted it, and that the opportunity presented itself in the basement [of] 17 Burton Street back in March of 1999." The prosecutor also argued that the fact that the defendant's mother had died fairly recently was irrelevant. Defense counsel replied that Andrews' testimony regarding his mother's death was not intended to elicit sympathy from the jurors but to show that the defendant had the financial resources necessary to purchase drugs on a regular basis and he thus had no motive to rob the victim.

The trial court granted the state's motion in limine on the ground that Andrews' testimony was not relevant and that the defendant, who defense counsel had represented would testify in his own defense, could provide the same information. Consequently, the defendant was the sole defense witness.

The defendant subsequently testified that, following his mother's death in 1998, he received more than $100,000 in cash and "annuities" that "should have lasted the rest of [his] life." He further testified that he had gained initial access to this money in the summer of 1998 and had used it to purchase "[j]ewelry, clothes, crack [cocaine], mostly drugs, and clothes—mostly drugs and clothes."

Defense counsel later referred in passing to the defendant's inheritance during closing argument. After the prosecutor initially argued that the case was about a woman who had lost her life at the hands of the defendant, "who wanted to fuel his lifelong addiction to crack cocaine," defense counsel responded that the defendant had not been present "when [the victim] was killed," that his signed statement confessing to his presence was involuntary because he did not understand what he was signing, and that he had no motivation or "need to go after anybody for . . . crack [cocaine]. In 1999, [the defendant] had plenty of money" to purchase drugs. The prosecutor reiterated during rebuttal that the defendant had been motivated to commit the attempted robbery by his immediate need to get more crack due to his craving and desire for the drug. The prosecutor described the defendant as a person consumed by a "drug fueled frenzy in that basement, seeing the opportunity to get himself that nice, big . . . rock of crack cocaine."

We begin our analysis with the governing legal principles. It is well established that "[t]he federal constitution require[s] that criminal defendants be afforded a meaningful opportunity to present a complete defense. . . . The sixth amendment . . . [guarantees] the right to offer the testimony of witnesses, and to compel their attendance, if necessary, [and] is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so that it may decide where the truth lies. . . .

When defense evidence is excluded, such exclusion may give rise to a claim of denial of the right to present a defense. . . . A defendant is, however, bound by the rules of evidence in presenting a defense. . . . Although exclusionary rules of evidence cannot be applied mechanistically to deprive a defendant of his rights, the constitution does not require that a defendant be permitted to present every piece of evidence he wishes. . . . If the proffered evidence is not relevant, the defendant's right to confrontation is not affected, and the evidence was properly excluded." (Internal quotation marks omitted.) *State* v. *Hedge*, 297 Conn. 621, 634, 1 A.3d 1051 (2010)

"[R]elevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . Evidence is relevant if it tends to make the existence or nonexistence of any other fact more probable or less probable than it would be without such evidence. . . . To be relevant, the evidence need not exclude all other possibilities; it is sufficient if it tends to support the conclusion [for which it is offered], even to a slight degree. . . . All that is required is that the evidence tend to support a relevant fact even to as light degree, so long as it is not prejudicial or merely cumulative." (Internal quotation marks omitted.) *Chief Information Officer* v. *Computers Plus Center, Inc.*, 310 Conn. 60, 102, 74 A.3d 1242 (2013).

"We review the trial court's decision to admit evidence, if premised on a correct view of the law . . . for an abuse of discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion." (Internal quotation marks omitted.) *State* v. *Coccomo*, 302 Conn. 664, 707, 31 A.3d 1012 (2011). "In determining whether there has been an abuse of discretion, the ultimate issue is whether the court could reasonably conclude as it did." (Internal quotation marks omitted.) *State* v. *Arthur H.*, 288 Conn. 582, 595, 953 A.2d 630 (2008).

Turning to the defendant's claim, we have stated that "[w]hether a trial court's . . . restriction of a defendant's or defense [witness'] testimony in a criminal trial deprives a defendant of his [constitutional] right to present a defense is a question that must be resolved on a case by case basis. . . . The primary consideration in determining whether a trial court's ruling violated a defendant's right to present a defense is the centrality of the excluded evidence to the claim or claims raised by the defendant at trial." (Citation omitted; internal quotation marks omitted.) *State* v. *Sandoval*, 263 Conn. 524, 546, 821 A.2d 247 (2003); accord *State* v. *Saunders*, 267 Conn. 363, 385, 838 A.2d 186, cert. denied, 541 U.S. 1036, 124 S. Ct. 2113, 158 L. Ed. 2d 722 (2004).

In the present case, the defendant's theory of defense was that he was not present at the crime scene.

Although defense counsel briefly mentioned during his summation that the defendant had no motivation to participate in the attempted robbery because he had plenty of money with which to purchase drugs, counsel repeatedly argued that the defendant was not present in the basement when the murder was committed. In making this point, he first challenged Russell's recollection that the defendant was in the basement by suggesting that her memory was distorted because she was under the influence of heroin. He next challenged the validity of the defendant's signed confession to the police admitting his presence in the basement on the ground that he did not understand what he was signing. He then concluded: "And so there is a reasonable doubt, even more so, even heavier, about whether [the defendant] was present at 17 Burton Street [in] March, 1999. Yeah, there is information. Yeah, there is testimony. Yes, there is some evidence, but there is no proof . . . beyond a reasonable doubt that [the defendant] tried to rob [the victim] with anyone, or that [the defendant] killed [the victim], either acting as a principal or being aided by someone else. You just don't have that much evidence. And you can't say he probably did it." Thus, Andrews' testimony that the defendant had received an inheritance from his mother was at best a tangential issue and entirely unrelated to the defendant's theory that he was not present in the basement at 17 Burton Street when the victim was murdered. Accordingly, the trial court's ruling to preclude Andrews from testifying did not rise to the level of a constitutional violation.

We nevertheless consider whether the trial court's decision to preclude Andrews' testimony was improper on purely evidentiary grounds. See *State* v. *Saunders*, supra, 267 Conn. 386 (even though trial court's preclusion of testimony was not violation of constitutional magnitude, defendant was "entitled to reversal of his conviction if he [could] establish that the exclusion was both improper and harmful"). In this respect, we note that Russell initially testified in the state's case-in-chief that the defendant had money whenever she was around him. The defendant later testified that, the year before the murder, he had received $100,000 in cash and annuities from his mother's estate, which "should have lasted the rest of [his] life," and that he had used the money to buy drugs, clothing and jewelry. Defense counsel gave no indication in his offer of proof that Andrews' testimony would have differed in any essential respect from that of the defendant. In fact, counsel's offer of proof suggested that Andrews' testimony would have been less detailed because there was no hint in the proffer that Andrews would testify as to how much money the defendant had received, the form in which he had received it, and how he had been spending the money prior to the victim's murder. Accordingly, we conclude that Andrews' testimony would have been merely cumulative and would not have affected the

jury's determination regarding the defendant's motivation and guilt.

The defendant nevertheless argues that Andrews would have been a more "neutral" witness than the defendant and that the jury would have found her testimony regarding the inheritance more credible. We agree that Andrews would have corroborated the defendant's testimony on the issue of his inheritance and might even have been more credible. The testimony regarding the inheritance, however, was not disputed by the parties, and, as previously discussed, was not a central issue in the case, because it was completely unrelated to his defense that he was not present at the crime scene. Accordingly, the trial court did not abuse its discretion in precluding Andrews' testimony.

## II

The defendant next claims that he was deprived of his due process right to a fair trial due to a pattern of prosecutorial impropriety. He specifically claims that the prosecutor engaged in vitriolic and improper questioning during cross-examination and that he viciously attacked the defendant, argued facts not in evidence, appealed to the jurors' emotions, and denigrated the defendant's credibility during closing argument. The defendant concedes that he did not preserve this claim at trial and now seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). The state responds that the defendant has failed to show the existence of any prosecutorial impropriety and that, to the extent any improprieties occurred, the defendant has failed to establish that they resulted in a deprivation of his due process rights. We agree with the state that there was no prosecutorial impropriety.

"[T]he touchstone of due process analysis in cases of alleged prosecutorial [impropriety] is the fairness of the trial, and not the culpability of the prosecutor. . . . The issue is whether the prosecutor's conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process. . . . In determining whether the defendant was denied a fair trial [by virtue of prosecutorial impropriety] we must view the prosecutor's comments in the context of the entire trial." (Internal quotation marks omitted.) *State* v. *Stevenson*, 269 Conn. 563, 571, 849 A.2d 626 (2004).

"[I]n analyzing claims of prosecutorial [impropriety], we engage in a two step analytical process. The two steps are separate and distinct: (1) whether [an impropriety] occurred in the first instance; and (2) whether that [impropriety] deprived [the] defendant of his due process right to a fair trial. Put differently, [an impropriety is an impropriety], regardless of its ultimate effect on the fairness of the trial; whether that [impropriety] caused or contributed to a due process violation is a separate and distinct question . . . ." (Internal quota-

tion marks omitted.) Id., 572.

"[I]n cases involving incidents of prosecutorial [impropriety] that were not objected to at trial . . . it is unnecessary for the defendant to seek to prevail under the specific requirements of [*Golding*], and, similarly, it is unnecessary for a reviewing court to apply the four-pronged *Golding* test. The reason for this is that the touchstone for appellate review of claims of prosecutorial [impropriety] is a determination of whether the defendant was deprived of his right to a fair trial, and this determination must involve the application of the factors set [forth] by this court in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). As we stated in that case: In determining whether prosecutorial [impropriety] was so serious as to amount to a denial of due process, this court, in conformity with courts in other jurisdictions, has focused on several factors. Among them are the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case. . . .

"Regardless of whether the defendant has objected to an . . . [impropriety], a reviewing court must apply the *Williams* factors to the entire trial, because there is no way to determine whether the defendant was deprived of his right to a fair trial unless the [impropriety] is viewed in light of the entire trial. The application of the *Williams* factors, therefore, is identical to the third and fourth prongs of *Golding*, namely, whether the constitutional violation exists, and whether it was harmful. . . . [Thus], following a determination that prosecutorial [impropriety] has occurred, regardless of whether it was objected to, an appellate court must apply the *Williams* factors to the entire trial.

"This does not mean, however, that the absence of an objection at trial does not play a significant role in the application of the *Williams* factors. To the contrary, the determination of whether a new trial or proceeding is warranted depends, in part, on whether defense counsel has made a timely objection to any . . . [prosecutorial impropriety]. When defense counsel does not object, request a curative instruction or move for a mistrial, he presumably does not view the alleged impropriety as prejudicial enough to [seriously] jeopardize . . . the defendant's right to a fair trial. . . . Moreover, ordinarily, when a defendant who raises an objection to the allegedly improper remarks of a prosecutor elects to pursue one remedy at trial instead of another, he will not be permitted to claim on appeal that the remedy he pursued was insufficient. . . . In other words, the fact that defense counsel did not object to one or more . . . [improprieties] must be consid-

ered in determining whether and to what extent the [impropriety] contributed to depriving the defendant of a fair trial and whether, therefore, reversal is warranted.

"We emphasize the responsibility of defense counsel, at the very least, to object to perceived prosecutorial improprieties as they occur at trial, and we continue to adhere to the well established maxim that defense counsel's failure to object to the prosecutor's argument when it was made suggests that defense counsel did not believe that it was unfair in light of the record of the case at the time. . . . Moreover . . . defense counsel may elect not to object to arguments that he or she deems marginally objectionable for tactical reasons, namely, because he or she does not want to draw the jury's attention to it or because he or she wants to later refute that argument. . . . Accordingly, we emphasize that counsel's failure to object at trial, while not by itself fatal to a defendant's claim, frequently will indicate on appellate review that the challenged comments do not rise to the magnitude of constitutional error . . . . Put differently . . . prosecutorial [impropriety] claims [are] not intended to provide an avenue for the tactical sandbagging of our trial courts but, rather, to address gross prosecutorial improprieties that . . . have deprived a criminal defendant of his right to a fair trial." (Citations omitted; emphasis omitted; footnotes omitted; internal quotation marks omitted.) *State* v. *Stevenson*, supra, 269 Conn. 572–76.

With these principles in mind, we first consider whether the prosecutor in the present case committed the alleged improprieties. If we determine that he did, we will then conduct a separate analysis to determine whether the improprieties deprived the defendant of his right to a fair trial.

A

We begin with the alleged improprieties that occurred during the prosecutor's cross-examination of the defendant. The defendant claims that the prosecutor engaged in aggressive, derogatory and sarcastic questioning when he (1) asked the defendant if he had been arrested "[p]retty much everywhere you've been," (2) queried, with respect to the detectives who questioned him at the police station, "[d]id you think, all of a sudden, boy, these are a good bunch of guys, I think I'll, you know, hang out with them, do what they want me to do," (3) stated, concerning the defendant's medication, "[i]t's not like—correct me if I'm wrong—you're not out of your mind crazy, you don't know what's going on, right," (4) asked, regarding the defendant's need for drugs, "if you don't have the drugs, are the demons screaming at you," (5) described the defendant's portrayal of Russell as a "scorn[ed]" woman, (6) sarcastically asked, "did you get the sense from [Russell's] testifying that she was trying to seduce you at that point when she was up there crying for hours in a row, refusing to look

over at you," and (7) denigrated and mocked the defendant when he said, "[c]ome on" and "did it pop a light bulb in your head . . . ?" The defendant argues that the foregoing comments were inflammatory, hostile and designed to arouse the emotions, passions, and prejudices of the jurors, thus leading them to conclude that the defendant was telling a ridiculous story, a theme later stressed by the prosecutor during his closing argument.

The state replies that the defendant has merely lumped together a number of unpreserved evidentiary challenges and labeled them as prosecutorial improprieties for the purpose of obtaining appellate review that otherwise would be unavailable. The state also argues that, when considered in context, none of the prosecutor's questions and comments during his cross-examination of the defendant was improper. We agree with the state.

It is well established that a prosecutor may not appeal to the emotions, passions and prejudices of the jurors by denigrating a witness through the frequent and gratuitous use of sarcasm. See, e.g., *State* v. *Wilson*, 308 Conn. 412, 436, 64 A.3d 91 (2013); see also *State* v. *Salamon*, 287 Conn. 509, 564, 949 A.2d 1092 (2008) ("gratuitous use of sarcasm and repeated questioning of [the witness] as to matters that he already had explored thoroughly with [the witness]" improperly conveyed prosecutor's own belief that witness was not credible); *State* v. *Rizzo*, 266 Conn. 171, 263, 833 A.2d 363 (2003) (use of needless sarcasm during cross-examination of defense witness "[may call on] the jurors' feelings of disdain, and [may send] them the message that the use of sarcasm, rather than reasoned and moral judgment, as a method of argument [is] permissible and appropriate for them to use"). We also have stated, however, that defense counsel's failure to object to allegedly sarcastic and denigrating comments and questions by the prosecutor during cross-examination, as in the present case, suggests that counsel did not believe the alleged improprieties were unfair in light of the record at that time. E.g., *State* v. *Medrano*, 308 Conn. 604, 621, 65 A.3d 503 (2013). Accordingly, we consider each alleged impropriety in the context in which it occurred, with the challenged language italicized. In performing this task, we are constrained by our inability to assess the tone and body language of the prosecutor and the defendant, and the limitations necessarily imposed by our reliance on the cold, printed record.

The first alleged impropriety occurred during an exchange between the prosecutor and the defendant concerning the defendant's prior arrests.[5] After the prosecutor elicited testimony from the defendant that he had been arrested dozens of times in Connecticut, Georgia and New Hampshire, the prosecutor summarized his testimony by asking: "*Pretty much everywhere*

*you've been, right*?" (Emphasis added.) The trial court overruled defense counsel's objection to the question as a mischaracterization of the evidence because "the question was whether he's been arrested everywhere he's been. He can answer that." The defendant thereafter responded: "No. I've been a whole lot of places that I ain't been arrested."

We conclude that the prosecutor's question was not improper because it was intended to summarize the defendant's preceding acknowledgment during his testimony that he had been arrested "dozens and dozens" of times in Connecticut and two other states, thus suggesting that he had been arrested in many different places. The defendant also was given an opportunity to respond and, in so doing, denied that he had been arrested "[p]retty much everywhere . . . ." Accordingly, although the question, viewed in isolation, might appear to be sarcastic, it represented a reasonable inference to be drawn from the defendant's prior testimony regarding the number and location of his many prior arrests.

The second alleged impropriety occurred during an exchange between the prosecutor and the defendant concerning the defendant's attitude toward the detectives who questioned him on the second day of his interrogation, during which he signed a written statement in which he confessed to his involvement in the crime but that he repudiated at trial on the ground that he had not understood its contents.[6] After the defendant testified that the detectives had "[p]unched [him] up," "[got him] drunk," and then turned friendly and "buddy, buddy," thus implying they were trying to cajole him into signing the statement after physically beating him, the prosecutor asked: "*Did you think, all of a sudden, boy, these are a good bunch of guys, I think I'll, you know, hang out with them, do what they want me to do*?" (Emphasis added.) The defendant responded that he had signed the statement so that the detectives would leave him alone.

We conclude that the prosecutor's question was not improper because its clear and obvious purpose was to clarify the defendant's reasons for signing the statement. To the extent the defendant also suggests that the question was sarcastic because of its informal language, the language was consistent with the language that the defendant used in his prior testimony when stating that the detectives had "[p]unched me up, then [got] me drunk and [made] friends with me . . . everybody was buddy, buddy."

The third alleged impropriety occurred during an exchange between the prosecutor and the defendant regarding the defendant's state of mind and his ability to understand what he was reading when the detectives presented him with the written statement, which was typed by one of the detectives while the defendant was

telling them what had happened on the night of March 20, 1999.[7] The prosecutor asked the defendant if his need for prescription medication had affected his ability to understand what was going on during the interrogation, to which the defendant responded that he did understand. The prosecutor then asked: "*It's not like— correct me if I'm wrong—you're not out of your mind crazy, you don't know what's going on, right*"; (emphasis added); to which the defendant responded, "[n]o."

We conclude that the prosecutor's reference to the fact that the defendant was not "out of [his] mind crazy" when not on his medication was not improper. The prosecutor's language was colloquial and perhaps needlessly colorful but was not inappropriate because it did not describe the defendant as crazy but, rather, emphasized the defendant's prior testimony that he was in full possession of his faculties and thus understood what he was doing when he signed the written statement.

The fourth alleged impropriety occurred during an exchange between the prosecutor and the defendant regarding the defendant's reasons for using drugs and the effect of his addiction on his family relationships.[8] After the defendant testified that he started using drugs to "get rid of" and "quiet . . . down" the demons in his head, which were caused by violent childhood beatings, the prosecutor asked: "*So, if you don't have the drugs, are the demons screaming at you*"; (emphasis added); to which the defendant responded that the demons caused him to avoid people as much as possible, even when he was using drugs, because being around people frightened him.

We conclude that the prosecutor's question was not improper because it was intended to elicit information regarding the cause of the defendant's addiction and the effect of drugs on his state of mind. Insofar as the prosecutor referred to demons screaming at the defendant when he was not on drugs, his use of this language was consistent with the defendant's own reference to demons in his head when he was describing the cause of his addiction.

The fifth and sixth alleged improprieties occurred during an exchange between the prosecutor and the defendant regarding the defendant's attitude toward Russell and her testimony at trial.[9] In probing whether the defendant's relationship with Russell before the crime had been contentious, the defendant testified that he did not think she had a grudge against him but that he had rebuffed her attempts to "seduce" him with drugs when he had met her a couple of times on the street because he never wanted anything to do with her. Thereafter, when the prosecutor asked whether Russell would have falsely accused him of being present at the crime scene, the defendant responded that he did not know because "[a] woman scorn[ed] could do

anything." The prosecutor then asked: "*Now she's scorn*[*ed*]?" (Emphasis added.) The defendant repeated that he had rejected Russell's attempts to seduce him with heroin because he did not use heroin, to which the prosecutor responded: "*And did you get the sense from her testifying that she was trying to seduce you at that point when she was up there crying for hours in a row, refusing to look over at you?*" (Emphasis added.)

We conclude that the prosecutor's first question regarding the defendant's description of Russell as a "scorn[ed]" woman was not improper. The question repeated the defendant's own description of Russell as "[a] woman scorn[ed]" and was intended to emphasize the incongruity of his initial testimony that he believed Russell bore no grudge against him and his later suggestion that she might have falsely accused him because he had rejected her attempts to seduce him with drugs.

We also conclude that the prosecutor's second question was not improper. There is no doubt that the question was confusing. The fact that a question is confusing, however, does not mean it is improper, even if the prosecutor took the concept of seduction out of context and used it inexplicably to describe the effect of Russell's tearful testimony on the defendant at trial.

The seventh and eighth alleged improprieties occurred during an exchange between the prosecutor and the defendant regarding the defendant's purported lack of knowledge as to the contents of the written statement he signed on the second day of his interrogation.[10] In discussing the defendant's numerous past arrests and interactions with the police, the prosecutor repeatedly attacked the defendant's vociferous denials that he never had been questioned and asked to sign a written statement following any of his other arrests. The prosecutor finally stated: "*Come on*. You said that [one of the police officers], the good guy, had brought you down and questioned you about this case in the past"; (emphasis added); in response to which the defendant repeated that he had not been asked to sign anything in the past. The prosecutor nevertheless continued to press the defendant on this issue and finally inquired about whether the defendant had been surprised at the length of the written statement and if he had wondered why it was so long when he initially saw it. The defendant replied that he had signed the statement without reading it because he wanted to go back to his jail cell. The prosecutor, however, continued to push the defendant for a more specific answer by asking: "Did it cause you any concern or *did it pop a light bulb in your head*, boy, there's a lot of typed up words on here; I wonder why there's so many?" (Emphasis added.) The defendant responded that there were a lot of typed words in the newspaper and that they also meant nothing.

We conclude that the prosecutor's use of the term,

"[c]ome on," and his reference to a light bulb "pop-[ping]" in the defendant's head were not improper. The prosecutor used the term "[c]ome on" in an effort to encourage the defendant to testify truthfully as to his prior experience in giving, or understanding the purpose of, written statements to the police, immediately after the defendant testified: "I've never had to sign a statement, ever, never, never, never. I [have] never been questioned by detectives, never, ever, ever, never. Is that enough nevers for you? Never. . . . I can tell you never—I [have] never been arrested. I [have] never been questioned. [I] never went through this. . . . I never went through this. I never did this before." Given the defendant's repeated and emphatic denials, the prosecutor's attempt to ensure that the defendant was being truthful by saying, "[c]ome on," was not inappropriate.

Similarly, asking the defendant whether the length of the written statement "pop[ped] a light bulb" in his head for the purpose of pointing out its potential significance was an appropriate rhetorical device that is commonly used in conversation to describe a sudden understanding or thought. Accordingly, we conclude that the foregoing questions were not improper.

B

We next address the improprieties that allegedly occurred during the prosecutor's closing argument. The defendant claims that the prosecutor improperly (1) denigrated the defendant and the manner in which he was arguing his case, (2) made several blatant appeals to the jurors' emotions, (3) argued facts not in evidence, (4) expressed his belief to the jury that the defendant was guilty, and (5) made two misleading, burden shifting arguments. The state responds that, when understood in their proper context, none of the comments to which the defendant refers was improper. We agree with the state.

"As we previously have recognized, prosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . When making closing arguments to the jury, [however] [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Moreover, [i]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper. . . . The occasional use of rhetorical devices is simply fair argument. . . .

"Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or

diverts the jury's attention from the facts of the case. [The prosecutor] is not only an officer of the court, like every attorney, but is also a high public officer, representing the people of the [s]tate, who seek impartial justice for the guilty as much as for the innocent. . . . By reason of his office, he usually exercises great influence upon jurors. His conduct and language in the trial of cases in which human life or liberty [is] at stake should be forceful, but fair, because he represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice, or resentment. If the accused [is] guilty, he should [nonetheless] be convicted only after a fair trial, conducted strictly according to the sound and well-established rules which the laws prescribe. While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or to suggest an inference from, facts not in evidence, or to present matters which the jury ha[s] no right to consider. . . . [W]hile [the prosecutor] may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one. . . .

"Furthermore, the prosecutor may not express his own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Nor should a prosecutor express his opinion, directly or indirectly, as to the guilt of the defendant. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions." (Citations omitted; internal quotation marks omitted.) *State* v. *Colon*, 272 Conn. 106, 237–38, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005).

1

The defendant first claims that the prosecutor improperly denigrated him personally and his theory of the case by (1) calling him a "hardened criminal," (2) stating that his testimony disavowing any knowledge of what was in the written statement "just doesn't make any sense," (3) arguing that the defense would have challenged a video-recorded statement from the defendant, which the defense suggested would have been preferable, to the same extent it challenged the validity of the defendant's written statement, (4) accusing the defense of focusing on insignificant evidence, and (5) engaging in unnecessary sarcasm by referring to the defendant's testimony that he had been given alcoholic

beverages during his interrogation as "happy hour at the police department."

We begin with the prosecutor's characterization of the defendant as a "hardened criminal" and his description of the defendant's testimony that he did not know what was in the written statement as not making any sense.[11] The "hardened criminal" comment was followed by the prosecutor's observation that the defendant had "been in and out of . . . jail his entire life" and that he did not condemn the defendant as a "bad man" for his extensive criminal history but merely wanted the jury to think about how the defendant's past experience in jail would have affected his interactions with the police in the present case. The prosecutor argued that it did not make any sense, in light of the defendant's dozens of arrests and felony convictions, and his view of the police as manipulative and violent, to believe the defendant's testimony that he did not read, and did not know the contents of, the lengthy, written statement the police had given him to sign, implicating him in the victim's murder.

We conclude that the prosecutor's argument was not denigrating and sarcastic but fairly described the defendant in language reflecting his criminal past and correctly pointed out the logical inconsistency between his testimony regarding his extensive criminal history and his testimony that he did not know what was in the written statement he had signed. See *State* v. *Stevenson*, supra, 269 Conn. 584 (prosecutor's remark during closing argument describing defendant's explanation as "totally unbelievable" was "a comment on the evidence presented at trial, and it posited a reasonable inference that the jury itself could have drawn" [internal quotation marks omitted]). Accordingly, the prosecutor's argument was not improper.

We next consider the prosecutor's allegedly improper comment during rebuttal argument that the defense would have criticized the validity of the defendant's written statement even if it had been video-recorded. The prosecutor argued: "And now [defense counsel] talks about this being the age of technology, you know, [and that a confession] should be recorded, and that we wouldn't be here if they had recorded the confession. Really? *So, you wouldn't say that we had stopped the video camera at a particular time, and restarted it, and you wouldn't say that we turned it off and whacked the defendant around, or that we did all these other things, or that we had photoshopped it, or added stuff to it?* You have the evidence that's before you." (Emphasis added.)

We first note that moments before the prosecutor made this argument, defense counsel argued that the Waterbury Police Department had the capacity to video-record interviews with arrested persons to eliminate any future confusion as to how a statement had been

obtained and that, if there had been a video-recorded statement in the present case, "we wouldn't even be playing around with this."[12] Accordingly, the prosecutor's argument was intended to respond to defense counsel's remarks by pointing out that the use of such technology would not necessarily guarantee certainty and eliminate confusion since claims of photoshopping, i.e., the manipulation of a photograph, or turning the video recorder on and off could still be made to impugn the integrity of a recording. We therefore conclude that the prosecutor's argument was not improper.

The next alleged impropriety was the prosecutor's comment that the defense had focused on insignificant matters to raise reasonable doubt in the jurors' minds.[13] After defense counsel argued that the jury should consider as a "key piece of evidence" the fact that nothing on the victim's body, including a hair on her face, could be traced to the defendant, the prosecutor argued in rebuttal that the state did not have to make a perfect case. In support of this point, he specifically argued that defense counsel's reference to the lack of forensic evidence connecting the defendant to a hair on the victim's face was irrelevant and should not contribute to the jury's consideration of reasonable doubt. He specifically urged the jury to consider that "[*t*]*here is not one shred of evidence, not one shred of evidence, that that hair has any importance at all in this case*, but what the defense attorney wants you to do is say, 'that's reasonable doubt.' That's not reasonable doubt. There is no evidence about what it was." (Emphasis added.)

We conclude that the prosecutor's argument was not improper. Defense counsel first argued that there was no forensic evidence, including the hair found on the victim's face, connecting the defendant to the victim. The defense thus opened the door for the prosecutor to argue in rebuttal that the lack of evidence connecting the hair to the defendant was not only unimportant but insufficient to support a finding of reasonable doubt. Accordingly, the prosecutor did not improperly "denigrate" the defendant's theory of the case but properly challenged the significance of the evidence on which the defense had relied.

We finally consider the prosecutor's reference to "happy hour at the police department" in response to defense counsel's argument that the defendant did not understand the written statement he signed because his request for his prescription medication was denied and he thus was mentally impaired. The prosecutor argued: "[The defendant] could remember even without this medication all of the details of what happened in the police department, and he was supposedly— apparently *it was happy hour at the police department.* I mean, you know, you can get rum, you can get tequila, you can get long-neck [beers] and cups of brandy, so drunk that he couldn't control himself in terms of not

signing this statement, but [he] can remember every single detail, didn't have his medication, after [e]ffects of crack cocaine, and drunk, yet remembers every single detail of what happened. Does that make any sense? Absolutely not." (Emphasis added.)

The defendant refers to the "happy hour" comment as unnecessarily sarcastic. We disagree. Although the prosecutor's reference to "happy hour at the police department" was colorful, prosecutors may use rhetorical devices to focus the jury's attention on points they want to emphasize during their argument. In this case, the "happy hour" comment was likely intended to demonstrate the inconsistency between the defendant's assertion that he understood everything that had happened during the interrogation, even after the detectives had served him liquor and tried to get him drunk, and his assertion that he had not understood what had happened during the interrogation because of a mental impairment caused by his need for medication. It also very likely was intended to suggest that the defendant's testimony that he had been given a variety of alcoholic beverages during the interrogation was absurd. See, e.g., *State* v. *Coney*, 266 Conn. 787, 812 n.23, 835 A.2d 977 (2003) ("[a]lthough prosecutors are bound by constitutional constraints and the restraints of adversarial propriety, they are not shackled by the chains of inadequate advocacy"). Accordingly, the comment was not improper.

2

The defendant next claims that the prosecutor improperly appealed to the jurors' emotions by describing the case as "a brutal, vicious, drug-filled homicide, about a young woman who lost her life at the squeezing hands of the defendant, who wanted to fuel his lifelong addition to crack cocaine," and by characterizing Russell as "trembling, trembling, physically trembling, crying uncontrollably almost, during her testimony . . . ." We disagree.

The prosecutor's description of the case occurred at the start of his closing argument, in order to focus the jury's attention on the brutality of the murder. The prosecutor argued: "Let's keep focused on what this case is about. *This case is about a brutal, vicious, drug-filled homicide, about a young woman who lost her life at the squeezing hands of the defendant, who wanted to fuel his lifelong addiction to crack cocaine.* That's what this case is about." (Emphasis added.)

We conclude that the foregoing comment was not improper because it was an accurate description of the case. A prosecutor is not precluded from using descriptive language that portrays the nature and enormity of the crime when supported by the evidence. Thus, to the extent the prosecutor's language appealed to the jurors' emotions, it did so because of the nature

of the crime and not because of the terminology the prosecutor used to get his point across. See, e.g., *State v. Reynolds*, 264 Conn. 1, 187, 836 A.2d 224 (2003) (prosecutor may point out egregious nature of conduct under consideration), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004).

With respect to Russell, the prosecutor argued in part that, despite her admission that she was a drug user with many personal issues, her testimony was truthful.[14] After describing her drug habit and some of her other personal problems, the prosecutor urged the jury to credit her testimony as authentic by arguing that "[t]he fact that she would come in and say those things, which are so embarrassing to her, and that *she would be trembling, trembling, physically trembling, crying uncontrollably almost, during her testimony*, supports the fact that she was being truthful. And her testimony corroborates the police testimony because much of what she says happens is what the police say they heard from the mouth of the defendant. And look to her demeanor on the stand." (Emphasis added.)

We conclude that the prosecutor's reference to Russell as physically trembling and crying uncontrollably during her testimony was not improper. It was intended to point out certain physical attributes Russell displayed as a witness that were indicative of her authenticity and credibility. Shortly before he made the comments, the prosecutor asked the jury to observe the witnesses carefully: "Now, one of the most powerful tools that you have in your arsenal of common sense is to observe witnesses on the stand. You all are seated in such a fashion that you are close to the witness stand. You can watch how people act. You can watch how they respond to questions. You can watch the expressions on their face[s]. And I think it's not hard, based on this evidence, to remember . . . Russell's reaction when she testified in this case. Her actions physically on the witness stand were consistent with someone who was terrified."

"Our law is well settled that it is a jury's duty to determine the credibility of witnesses and to do so by observing firsthand their conduct, demeanor and attitude." (Internal quotation marks omitted.) *State* v. *Gilberto L.*, 292 Conn. 226, 247, 972 A.2d 205 (2009). Accordingly, we conclude that the prosecutor's reference to Russell's trembling and crying on the witness stand was not improper and did not unduly appeal to the jurors' emotions; rather, it was an accurate description of her demeanor that was intended to persuade the jury that she was a credible witness.

3

The defendant next claims that the prosecutor argued facts not in evidence when he stated, in discussing the crime scene, that the "details don't line up perfectly

like they do on TV" and when he argued, with respect to the methods used by the police for obtaining information, that it takes more effort to obtain information from someone who has been through the system. We disagree.

The prosecutor argued on rebuttal that the "details don't line up perfectly like they do on TV" in discussing whether Russell's testimony regarding what had happened in the basement was consistent with the testimony of the defendant.[15] The prosecutor then asked the jury to use common sense when comparing their testimony: "And, you know, all this crime scene stuff. People watch too much [Crime Scene Investigation (CSI)]. *If things—details don't line up perfectly like they do on TV*, where they find a twig, or a hair, and, all of [a] sudden, the whole case is busted wide open. This is a homicide from [twelve, thirteen] years ago. Use your common sense and look at the major details that all do line up." (Emphasis added.)

We conclude that the prosecutor's comments comparing what ordinarily happens in a popular television crime show, in which the evidence may appear to be consistent and point to a specific result, with real life situations in which the evidence may not be consistent were not improper because he did not introduce new facts that would have affected the jurors' determination of guilt. The comparison merely was intended to advise the jurors that scripted television dramas do not necessarily reflect real life situations and that the jurors should not expect the testimony of different witnesses to be in perfect accord.

With respect to the prosecutor's suggestion on rebuttal that it may take more effort to obtain information from persons who have "been through the system" than from persons who have not, he did not make the suggestion in the form of a statement of fact but in the form of the following question: "And think about just, you know, use your everyday common sense again. Think about the evolution of a statement. How is it that the police get information from people? I'm sure—I'm sure that there are people who go in without the police even knowing they've committed a crime, and they go to the front desk and say, 'I did a horrible thing. I have to tell you, I killed my wife. I got drunk and I ran over somebody on the highway. I'm here. Take me. I confess.' That happens. But, but—*somebody who's been through the system all that time, don't you think it takes the police a little bit of work to get it out of them*? Hey, look. We got . . . Russell. She told us what happened. We got other witnesses who put you there. You get it piece by piece. . . . I mean, that's just human behavior [to initially deny the truth]. If you are in a position where you don't want to tell that you've done something bad, you try to keep it a secret until you know you can't keep it a secret anymore." (Emphasis added.)

We conclude that the prosecutor's suggestion that it may take more time to obtain information from someone who has "been through the system" was not offered as an evidentiary fact to be considered by the jury but as a way to view Russell's testimony in determining whether she was a credible witness. Accordingly, the suggestion did not rise to the level of improper argument.

4

The defendant next claims that the prosecutor improperly expressed to the jurors his own belief that the defendant was guilty when he stated that "one of the things that prosecutors sometimes get in trouble [for] in closing arguments is saying what they believe, okay. My function here is not to convince you that I believe the defendant is guilty. What my opinion is does not matter . . . I'm not here to convince you that I think he's guilty." We disagree.

It is true that the prosecutor stated two different times in his closing argument that he was not trying to convince the jurors that he believed the defendant was guilty.[16] His comments, however, although suggestive, were not improper for two reasons. First, he never stated his personal belief that the defendant was guilty but only that his function was not to convince the jury that he believed the defendant was guilty. Second, his references to his own belief were accompanied by other qualifying language indicating that what he believed did not matter and that the jurors must decide whether the defendant was guilty by relying on their common sense and their capacity to critically evaluate the evidence. Accordingly, the prosecutor's insinuations regarding his personal belief as to the defendant's guilt were not improper.

5

The defendant next claims that the prosecutor improperly made two burden shifting arguments when he stated, with respect to a hair found on the victim's face, that the defense had "access to the state forensic lab, they can put on witnesses if they want to from the lab," and when he allegedly misstated the state's burden of proof by claiming that it did not have to prove the moment of death.[17] We disagree.

With respect to the first claim, the prosecutor responded to defense counsel's argument that "a key piece of evidence" was the lack of anything on the victim's body, including a hair on her face, that could be traced to the defendant, as follows: "*There is not one shred of evidence, not one shred of evidence, that that hair has any importance at all in this case,* but what the defense attorney wants you to do is say, 'that's reasonable doubt.' That's not reasonable doubt. There is no evidence about what it was. *They have access to the state forensic lab, they can put on witnesses if they*

*want to from the lab.* Don't be led down that path."
(Emphasis added.)

It is well established that a party may comment on an opposing party's failure to call a witness during closing argument. See, e.g., *State* v. *Malave*, 250 Conn. 722, 739–40, 737 A.2d 442 (1999), cert. denied, 528 U.S. 1170, 120 S. Ct. 1195, 145 L. Ed. 2d 1099 (2000). In *Malave*, we stated that "we do not prohibit counsel from making appropriate comment, in closing arguments, about the absence of a particular witness, insofar as that witness' absence may reflect on the weakness of the opposing party's case. . . . [As] long as counsel does not directly exhort the jury to draw an adverse inference by virtue of the witness' absence . . . [such comment is allowed]." (Footnote omitted.) Id., 739; see also *State* v. *Clark*, 48 Conn. App. 812, 831–32, 713 A.2d 834 (comment on missing witnesses proper when prosecutor did not ask jurors to draw adverse inference from absence of witnesses), cert. denied, 245 Conn. 921, 717 A.2d 238 (1998); *State* v. *Ross*, 18 Conn. App. 423, 432–33, 558 A.2d 1015 (1989) (prosecutor's comment on absence of witnesses constituted fair argument on weakness of defendant's case).

In the present case, we conclude that the prosecutor did not ask the jury to draw an adverse inference from the failure of the defense to call witnesses from the forensic laboratory to give testimony on the hair, thus misallocating the burden of proof, but argued instead that there was no evidence to support defense counsel's claim as to the significance of the hair, which the defense could have adduced by calling witnesses from the state forensic laboratory. Accordingly, the prosecutor's comments were directed to the weakness of the defense's theory that the hair was a key element in the case because the defense had produced no evidence regarding its significance.

With respect to the second burden shifting claim, the prosecutor argued: "*I don't have to prove the moment of death*, and I don't have to prove that he's the one [who] inflicted the fatal blow. As to the felony murder count, all I have to prove is that these guys were in on a robbery trying to get that crack cocaine, and, as a result of that robbery, is that she ended up dead. That's it." (Emphasis added.)

We conclude that the prosecutor's comment that the state did not have to prove the moment of death was a correct statement of the law. The felony murder statute provides in relevant part: "A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery . . . and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants . . . ." General Statutes § 53a-54c. There is nothing in the statute that requires the state to prove

the moment of death. Accordingly, the prosecutor did not improperly shift the burden of proof to the defendant when he made this comment.

In sum, having determined that the defendant's claims of prosecutorial impropriety during cross-examination and closing argument have no merit, we conclude that there is no need to consider whether the defendant was deprived of his right to a fair trial under the second step of the two step analytical process for claims of prosecutorial impropriety.

### III

The defendant next claims that the state improperly relied on a different theory in this case than in its case against Smith, one of the alleged coassailants, when it charged the defendant with felony murder based on the predicate felony of attempted robbery but charged Smith with felony murder based on the predicate felony of attempted robbery or sexual assault. The defendant thus claims that his conviction was fundamentally unfair and his due process rights were violated under the fourteenth amendment to the United States constitution.

The defendant relies principally on *Smith* v. *Groose*, 205 F.3d 1045 (8th Cir.), cert. denied sub nom. *Gammon* v. *Smith*, 531 U.S. 985, 121 S. Ct. 441, 148 L. Ed. 2d 446 (2000), in which the Eighth Circuit Court of Appeals concluded that a prosecutor's "use of inherently factually contradictory theories violates the principles of due process." Id., 1052; see also *United States* v. *Higgs*, 353 F.3d 281, 326 (4th Cir. 2003). Although the defendant concedes there is a split of authority on this issue; see, e.g., *United States* v. *Urso*, 369 F. Supp. 2d 254, 263–64 (E.D.N.Y. 2005) (discussing conflicting authorities); with no clear majority on either side, he argues that the authorities holding that the presentation of inconsistent theories violates due process are more persuasive and appear to be more consistent with the general tenets of Connecticut law.

We conclude that there is no need to address this issue of first impression in Connecticut because the defendant has failed to persuade us that the charges and theories in the two cases are contradictory. See *State* v. *Colon*, supra, 272 Conn. 244 (concluding that defendant's reliance on *Smith* v. *Groose*, supra, 205 F.3d 1045, was misplaced and avoiding consideration of whether presentation of inconsistent theories violates due process because prosecutor "was not pursuing inherently factually contradictory theories, as the defendant claim[ed]"). In the present case, both the defendant and Smith were charged with felony murder based on the predicate felony of attempted robbery. The fact that the felony murder charge in Smith's case also was based on the predicate felony of sexual assault does not mean, however, that the charges against the

two men and the theories on which they were based were inconsistent or contradictory. The attempted robbery and sexual assault that ended with the victim's murder were part of one continuous series of actions by three different men. See part IV of this opinion. Accordingly, the charges were complementary and were based on the state's evaluation of the evidence indicating the nature and extent of each man's participation in different aspects of the crimes against the victim.

## IV

The defendant next claims that the evidence was insufficient to support his conviction of felony murder. He claims that, although the evidence established that the victim died and that an attempted robbery occurred, it also established that the victim was sexually assaulted. Accordingly, it was incumbent on the state to prove that the victim was killed in the course of and in furtherance of the attempted robbery rather than the sexual assault, which the state failed to do. The state responds that the evidence was sufficient to support the defendant's conviction because the jury reasonably could have found that the victim died after being manually strangled by the defendant and Smith and that her death occurred within the period immediately before or after commission of the attempted robbery. The state also argues that the jury reasonably could have found, on the basis of the evidence, that the homicidal act was within the contemplation of the defendant and Smith because both men took turns manually strangling the victim in an attempt to force her to release the crack cocaine. We agree with the state.

The following additional facts are relevant to our resolution of this issue. On March 7, 2009, the day after the defendant was arrested and charged with murder, he gave oral and written statements to the police regarding his involvement in the crime. In his statements, the defendant explained that, in 1999, he was a "runner" who referred drug purchasers to drug sellers and received drugs in exchange for the referrals. In March, 1999, he brought the victim to a drug seller for a $100 purchase of crack cocaine and received $30 worth of crack cocaine in return. He and the victim then went to the basement of a house on Burton Street "where lots of people go to get high." Smith, who also was in the basement, began to argue with the victim about giving him some of her crack cocaine. Smith then hit the victim in her face, which caused her to fall down. Believing that the crack cocaine was in one of the victim's hands, which was clenched, and knowing that she had a fairly large quantity of the substance, the defendant explained in his signed, written statement: "I thought to myself, why should [Smith] get all the crack? . . . I want to get some for myself, so I went at [the victim]. [The victim] was trying to wrestle out from under [Smith], so I went up to the top of her head

and tried to control her head and get the crack. It was a frenzy. I grabbed her by the neck and, at one point to control her, I hit her in the head a couple [of] times. When I had her by the neck, I was squeezing her neck, trying to knock the wind out of her. After I had her by the neck, my hands were mostly on her chest and shoulders, but I did grab her neck a couple more times. Then [Smith] started to choke her, and she started to go out, by that, I mean, pass out. Then another guy jumped [in], and he hit her in the stomach. At one point, [Smith] got a metal thing. It was like some frame of a table or chair and [he] started to swing at [the victim]. It hit both me and her. All the while, [Smith] was still choking her. I was trying to grab at her hand to get the crack, but she wouldn't let go. When this was all going on, I remember seeing [Russell] . . . . I'm not sure when [Russell] left. The third guy started to pull [the victim's] pants down and then [Smith] pulled up her shirt; this is when [the victim] let go of the crack, when she tried to hold her pants so they wouldn't get down. [Smith] started to choke her again, and, eventually, she went out. When I mean she went out, her eyes were closed, she wasn't fighting no more. I don't know if she was dead or not, but she wasn't moving. I don't even know if she was breathing. The third guy was still pulling her pants down. I knew this was bad, so I got up and got out of there. I don't know what happened to the crack. I'm sure someone tried to get if off the floor." The defendant later identified Smith and Daniel from photographic arrays as the other two participants in the incident.

"In reviewing a sufficiency of the evidence claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty. . . .

"Additionally, the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . .

"Finally, [t]he trier of fact may credit part of a witness' testimony and reject other parts. . . . [W]e must defer to the jury's assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude . . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict." (Citations omitted; internal quotation marks omitted.) *State* v. *Brown*, 299 Conn. 640, 646–48, 11 A.3d 663 (2011).

In order to sustain the conviction of felony murder, the record must reflect that the state proved beyond a reasonable doubt that the victim's death was caused in the course of and in furtherance of the predicate felony, in this case, attempted robbery. See General Statutes § 53a-54c ("[a] person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery . . . and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants"). The requirement that the death occur "in the course of" the underlying felony imposes a temporal limitation on felony murder; *State* v. *Ghere*, 201 Conn. 289, 297, 513 A.2d 1226 (1986); whereas the requirement that the death occur "in furtherance of" the underlying felony imposes a causal limitation. *State* v. *Young*, 191 Conn. 636, 642, 469 A.2d 1189 (1983).

Applying these principles, we conclude that the victim's murder was committed during the course of and in furtherance of the predicate offense of attempted robbery.[18] With respect to the first requirement, we have stated that, under General Statutes § 53a-133, "if the use of force occurs during the continuous sequence of events surrounding the taking or attempted taking, even though some time immediately before or after, it is considered to be 'in the course of' the robbery or the attempted robbery within the meaning of the statute." *State* v. *Ghere*, supra, 201 Conn. 297. We thus concluded in *Ghere*, in which the state was required to prove that force was used in an attempted robbery, that, even though the use of force occurred after the demand for money, the temporal requirement between the use of force and the robbery had been met because the use of force occurred during a continuous sequence of events and the weapon was in the defendant's hand when the demand was made, even though the victim initially had not seen it. Id., 292, 297–98.

Similarly, in the present case, Russell testified and the defendant confessed that he attacked the victim and started choking her after she refused to comply with his demand for drugs or money. The defendant further testified that Smith choked the victim during the subsequent struggle, which the defendant described as a "frenzy," while the defendant tried to pry the crack

out of her clenched hand. Although the defendant stated that Smith continued to choke the victim to death after she released the crack in order to defend herself against Daniel, there is no doubt that the foregoing events occurred in a continuous, uninterrupted sequence over a short period of time, there being no apparent break between Smith's initial argument with the victim and her ultimate strangulation. We therefore conclude that the temporal requirement is satisfied and that the victim's death occurred in the course of the attempted robbery.

We also conclude that her death occurred in furtherance of the attempted robbery. This court has stated that "the phrase 'in furtherance of' was intended to impose the requirement of a relationship between the underlying felony and the homicide beyond that of mere causation in fact, similar to the concept of proximate cause in the law of torts. Primarily its purpose was to limit the liability of a person whose accomplice in one of the specified felonies has performed the homicidal act to those circumstances which were within the contemplation of the confederates to the undertaking, just as the liability of a principal for the acts of his servant is similarly confined to the scope of the agency. All who join in a common design to commit an unlawful act, the natural and probable consequence of the execution of which involves the contingency of taking human life, are responsible for a homicide committed by one of them while acting in pursuance of, or in furtherance of, the common design." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Young*, supra, 191 Conn. 642.

In the present case, the defendant, Smith and Daniel attacked the victim simultaneously to obtain her drugs or money. The defendant's written confession indicates that he "went up to the top of her head and tried to control her head and get the crack. It was a frenzy. I grabbed her by the neck and, at one point to control her, I hit her in the head a couple [of] times. When I had her by the neck, I was squeezing her neck, trying to knock the wind out of her. After I had her by the neck, my hands were mostly on her chest and shoulders, but I did grab her neck a couple more times. Then [Smith] started to choke her, and she started to go out . . . ." We therefore conclude that the victim's death occurred in furtherance of the attempted robbery.

The fact that the victim may have died while Smith purportedly continued to choke her after she released the crack cocaine does not mean that her death did not occur in furtherance of the attempted robbery. The choking was part of one continuous event that was initiated and perpetuated by the victim's refusal to surrender the crack cocaine and by her attackers' determination to obtain it. Furthermore, the defendant had to be aware that choking the victim likely would not merely

"knock the wind out of her" but easily could result in her death. Finally, the jury reasonably could have believed that the sexual assault was intended to force the victim to release the crack cocaine, which, according to the defendant's written statement, is exactly what happened when Daniels started pulling down her pants. Consequently, whether the victim's death occurred before or after she released the crack cocaine is of no importance.

Viewing the evidence in the light most favorable to sustaining the defendant's conviction, we conclude that the jury reasonably could have found that the victim's death occurred during the course of and in furtherance of the attempted robbery, and, therefore, the evidence was sufficient to support the jury's finding that the defendant was guilty of felony murder.

V

The defendant's final claim is that the trial court improperly denied his motion to suppress his oral and written statements to the police on March 6 and 7, 2009, in which he described his role in the events leading up to the victim's murder. The defendant argues that the statements were obtained involuntarily because he was under the influence of crack cocaine at the time of his initial interrogation and because his statements on the following day were made while he was suffering from crack cocaine withdrawal and in need of his prescription medication. The state responds that the statements were not made involuntarily because the trial court made no findings regarding his apparent drowsiness on the first day of interrogation, and, in any event, the defendant made no inculpatory statements on that day. With respect to the second day of interrogation, the state argues that the trial court did not find credible the defendant's testimony that he was under the influence of crack cocaine when he made the oral and written statements that implicated him in the crime. We agree with the state.

The following additional facts are relevant to our resolution of this issue. On March 6, 2009, the day of his arrest, the defendant was interviewed at the police station by Detectives George Tirado and Timothy Jackson. After signing a written advisement and waiver of his rights, the defendant repeatedly denied having any knowledge of, or responsibility for, the victim's murder. He later admitted that he had been present at 17 Burton Street when the crime was committed, but he denied any involvement. The defendant eventually began to nod off and fall asleep, telling the detectives that he was feeling the effects of, and "coming down" from, his prior consumption of crack cocaine. He then was booked and taken to a holding cell for the evening.

Around 12 p.m. the following day, the defendant was again interviewed by Tirado, who was accompanied by

Sergeant Michael Slavin. At that time, the defendant signed another written advisement and waiver of rights. After being confronted with information obtained by the police from Russell and Daniel, the defendant described his role in the crime, and provided and signed a detailed, written statement after signing a second written advisement and waiver of rights. Slavin testified that the defendant did not ask for any medication during the interrogation and that he had no apparent problem seeing or reading any printed materials he was given. Tirado further testified that the defendant "definitely had . . . slept off his high" from the day before and was able to respond to questions, did not appear confused, and did not ask for any medication. Slavin and Tirado also testified that the defendant never was threatened, yelled at, hit or otherwise mistreated during the interrogation.

Thereafter, prior to commencement of the trial, the defendant filed a motion to suppress his oral and written statements. The defendant claimed that the statements were obtained illegally under the federal and state constitutions because they had not been made pursuant to a knowing and intelligent waiver of his right against self-incrimination and with the assistance of counsel. Following a hearing, the court denied the motion to suppress.

In an oral ruling on the motion, the court first referred to the defendant's allegations, which he also made at trial, that he gave his statement to the police only after suffering physical abuse and assaultive behavior by members of the Waterbury Police Department, the continued effects of withdrawal from crack cocaine, reduced inhibitions arising from his need for prescribed medication, and intoxication due to the consumption of alcoholic beverages that the police had given to him. The court nonetheless concluded that the statements were voluntary. The court explained that the defendant had been advised of his rights on March 6, the first day of interrogation, and twice on March 7, and that he had waived his rights before giving his written statement on March 7. The court stated that the proper focus in deciding whether a statement was voluntary was on the conduct of the police and whether the record contained evidence of threats, promises or other coercive or deceptive measures. The court also stated that it had considered the testimony of Tirado and Slavin, the exhibits presented and the credibility of the witnesses, and had determined, in light of the totality of the circumstances, that the defendant's written statement was voluntary.

At trial, the defendant repudiated everything he had disclosed in the written statement and denied being present at the crime scene. Although he conceded that he had been arrested and taken to the police station, had signed a written statement waiving his rights, and

had spoken to the police, he denied all knowledge of, or participation in, the victim's murder. Consistent with his testimony at the suppression hearing, he testified that his denials caused Tirado to punch him several times in the head and that, when he continued his denials, he was given liquor and beer. After spending the night in the police station, he was interviewed again the following day, at which time he continued to deny knowledge of the victim's murder. According to the defendant, one of the detectives said that he knew the defendant had not committed the crime but should tell the police who did. When the defendant asked to call his wife to bring him his prescription medication, he was told that he could do so only after he revealed what he knew about the crime. The defendant testified that he eventually signed all of the papers he was given, including the written statement, because he was told to do so and wanted to get back to his jail cell. He added that the police indicated which photographs to select from the photographic arrays and that he had not been given an opportunity to read any of the documents before he was asked to sign them.

After the jury found the defendant guilty of felony murder and the defendant appealed to this court, he filed a motion for an articulation of the trial court's ruling on twelve different issues. The trial court denied the motion, but this court granted the defendant's motion for review and ordered the trial court to respond to five of the issues[19] relating to the trial court's findings on his mental health and drug addiction. The trial court responded that it had made no findings relating to four of the issues because it did not deem the defendant's testimony credible. With respect to the issue of the defendant's request for medication during the second day of interrogation, the court stated that Tirado had testified that the defendant never indicated any need for his prescription medication, the detective did not sense that the defendant needed medication, and the detective thus made no inquiry regarding his need for medication.

"[T]he use of an involuntary confession in a criminal trial is a violation of due process. . . . [T]he test of voluntariness is whether an examination of all the circumstances discloses that the conduct of law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined . . . . The ultimate test remains . . . [i]s the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process. . . . The determination, by the trial court, whether a confession is voluntary must be grounded [in] a consideration of the circumstances surrounding it. . . .

"Factors that may be taken into account, upon a proper factual showing, include: the youth of the accused; his lack of education; his intelligence; the lack of any advice as to his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as the deprivation of food and sleep. . . . Under the federal constitution, however, coercive police activity is a necessary predicate to the finding that a confession is not voluntary . . . .

"It is well settled that [t]he state bears the burden of proving the voluntariness of the defendant's confession by a preponderance of the evidence. . . . [As for] the scope of our review] we note the established rule that [t]he trial court's findings as to the circumstances surrounding the defendant's interrogation and confession are findings of fact . . . which will not be overturned unless they are clearly erroneous." (Citations omitted; internal quotation marks omitted.) *State* v. *Pinder*, 250 Conn. 385, 418–20, 736 A.2d 857 (1999).

"[A]lthough we give deference to the trial court concerning these subsidiary factual determinations, such deference is not proper concerning the ultimate legal determination of voluntariness. . . . Consistent with the well established approach taken by the United States Supreme Court, we review the voluntariness of a confession independently, based on our own scrupulous examination of the record." (Citations omitted; internal quotation marks omitted.) Id., 420. "[A]pplying the proper scope of review to the ultimate issue of voluntariness requires us . . . to conduct a plenary review of the record in order to make an independent determination of voluntariness." Id., 421.

We conclude, on the basis of the trial court's factual findings and under the totality of the circumstances, that the defendant's written statement was voluntary.[20] Although we recognize that the trial court may consider a defendant's emotional state, intoxication and mental disease in determining whether a confession is voluntary; see, e.g., *State* v. *Usry*, 205 Conn. 298, 305–306, 533 A.2d 212 (1987); the trial court in the present case stated in its ruling and articulation that it had evaluated the testimony of the police officers and the defendant and that it did not deem credible the defendant's testimony that he was under the influence of drugs and in need of his prescription medication on March 7, the second day of interrogation, when he signed the incriminating statement.

"[W]e may not substitute our judgment for that of the trial court when it comes to evaluating the credibility of a witness. . . . It is the exclusive province of the trier of fact to weigh conflicting testimony and make determinations of credibility, crediting some, all or none of any given witness' testimony. . . . Questions of

whether to believe or to disbelieve a competent witness are beyond our review. As a reviewing court, we may not retry the case or pass on the credibility of witnesses. . . . We must defer to the trier of fact's assessment of the credibility of the witnesses that is made on the basis of its firsthand observation of their conduct, demeanor and attitude." (Internal quotation marks omitted.) *State* v. *DeMarco*, 311 Conn. 510, 519–20, 88 A.3d 491 (2014). We therefore conclude that the trial court's credibility determination and its derivative findings that the defendant was not suffering from the effects of crack cocaine or from a lack of prescription medication when he signed the confession were not clearly erroneous, and, because there were no undisputed facts in the record that would lead us to conclude that the confession was involuntary, the defendant cannot prevail on his claim that the trial court improperly denied his motion to suppress.

The judgment is affirmed.

In this opinion ROGERS, C. J., and EVELEIGH, ESPINOSA and ROBINSON, Js., concurred.

[1] General Statutes § 53a-54c provides: "A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary, kidnapping, sexual assault in the first degree, aggravated sexual assault in the first degree, sexual assault in the third degree, sexual assault in the third degree with a firearm, escape in the first degree, or escape in the second degree and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants, except that in any prosecution under this section, in which the defendant was not the only participant in the underlying crime, it shall be an affirmative defense that the defendant: (1) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and (2) was not armed with a deadly weapon, or any dangerous instrument; and (3) had no reasonable ground to believe that any other participant was armed with such a weapon or instrument; and (4) had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury."

[2] The defendant initially was charged with one count of murder. On March 20, 2009, the state filed a substitute information containing seven counts, including the original count of murder. On April 27, 2011, the state filed a final substitute information charging the defendant with murder and felony murder.

[3] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him; [and] to have compulsory process for obtaining witnesses in his favor . . . ."

"A defendant's right to present a defense is rooted in the compulsory process and confrontation clauses of the sixth amendment . . . [which] are made applicable to state prosecutions through the due process clause of the fourteenth amendment. *Pointer* v. *Texas*, 380 U.S. 400, 403, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965) (right to confrontation); see *Washington* v. *Texas*, 388 U.S. 14, 18, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967) (right to compulsory process)." (Internal quotation marks omitted.) *State* v. *Hedge*, 297 Conn. 621, 625–26 n.2, 1 A.3d 1051 (2010).

[4] The defendant also claims that the trial court should have denied the state's oral motion in limine summarily as procedurally improper because Practice Book § 42-15 provides that a motion in limine must be in writing. The defendant argues that the apparent purpose of a written motion in limine, although not stated in the rules of practice, is to provide fair notice of the objection to the opposing party, and that the state's motion was designed to circumvent this purpose. The defendant, however, did not object to the motion on procedural grounds at the time it was made, does not claim on appeal that he was not provided with adequate notice to respond

or that he otherwise was harmed by the procedural impropriety, and cites no authority in support of his claim. Accordingly, we conclude that the claim has no merit.

[5] The following exchange occurred between the prosecutor and the defendant:

"Q. . . . So, how many felony convictions would you say that you have in all?

"A. I never said I wasn't arrested a multitude of times. I was arrested a lot, a lot, a lot of times.

"Q. I know. You were arrested a ton of times, but I'm talking about just the arrests that resulted in felony convictions. How many would you say you have?

"A. I have no idea.

"Q. You don't keep track of your criminal record?

"A. No. I pled guilty to anything and everything just to get it over with.

"Q. And, now, on the issue of being arrested, you've been arrested dozens and dozens of times, right?

"A. Yes, I have.

"Q. Not only here in Waterbury but out of state?

"A. Yes, I have.

"Q. What states?

"A. Georgia and New Hampshire.

"Q. *Pretty much everywhere you've been, right*?

* * *

"A. No. I've been a whole lot of places that I ain't been arrested." (Emphasis added.)

[6] The following exchange occurred between the prosecutor and the defendant:

"Q. Basically, [the police] wanted you to implicate yourself in a homicide that you knew nothing about?

"A. No. They wanted me to implicate other people. They . . . kept telling me, [we] know you didn't do it, just tell us what happened.

"Q. They want you to say things that aren't true in relation to this homicide?

"A. I don't know if they're true or not.

"Q. They want you to say things that you didn't know whether or not they are true about the homicide?

"A. Yes. Yes.

"Q. And that goes on for hours and hours and hours on day one?

"A. Yes.

"Q. They get you drunk, punch you, scream at you. I'm assuming—correct me if I'm wrong—you are not feeling very good about the Waterbury police at that point, right?

"A. No. Punched me up, then [got] me drunk and [made] friends with me . . . everybody was buddy, buddy.

"Q. Did you forgive them for punching you because they gave you a couple of drinks?

"A. No. I forgot about [Detective George] Tirado.

"Q. *Did you think, all of a sudden, boy, these are a good bunch of guys, I think I'll, you know, hang out with them, do what they want me to do*?

"A. No, because I didn't do what they wanted me to do. I didn't know nothing.

"Q. So, you would be at that point extremely suspect of anything that they ask you to sign or any piece of paper that they put under you and said, 'don't worry about it, just sign off on it.' Wouldn't you be a little bit leery about [that]?"

"A. No, because [the] Waterbury police beat up everybody.

"Q. Okay. And they beat up everybody because the people won't tell them what they want to [hear]?

"A. Evidently, yes.

* * *

"Q. Okay. So are those the kind of people that you're going to put your faith in and trust when they put a piece of paper under your nose and ask you to sign it?

"A. No, but I would sign it to stop it, to get them to leave me alone." (Emphasis added.)

[7] The following exchange occurred between the prosecutor and the defendant:

"Q. Okay. Now, before we get to day two [of the interrogation], let's talk about the medications that you're supposedly on. Okay, again, like with the glasses, are you making a claim to the jury that you couldn't understand

what was going on because you didn't have your pills?

"A. Never said that.

"Q. Okay. So did the fact that you . . . didn't have access to your pills, did that in any way restrict your ability to understand what was going on?

"A. No.

"Q. Did you understand what [the police] were saying to you.

"A. Yes.

"Q. *It's not like—correct me if I'm wrong—you're not out of your mind crazy, you don't know what's going on, right*?

"A. No." (Emphasis added.)

[8] The following exchange occurred between the prosecutor and the defendant:

"Q. Has your addiction caused you to spend pretty much your whole life in and out of jail?

"A. Yes.

\* \* \*

"Q. Has it cost you the loss of relationships with your family?

"A. No. Abuse caused me the loss of relationship[s] with my family. . . .

"Q. Does that make you angry?

"A. That's what got me using the drugs to cloud—to get rid of [the] demons that were in my head. That's what did it.

"Q. So [you were] beaten violently as a child?

"A. Yes.

"Q. Run to drugs to calm the demons in your head?

"A. To quiet them down, yes.

"Q. *So, if you don't have the drugs, are the demons screaming at you*?

"A. Telling me to get away from everybody, and even when I'm on the drugs, they make me leave people alone. They make me get away from people, not be around them. I don't like to be around people. Being around people scares me. I'm a big man today, yes." (Emphasis added.)

[9] The following exchange occurred between the prosecutor and the defendant:

"Q. Okay. So . . . Russell never had a grudge against you?

"A. I don't think so.

"Q. Never had run-ins with her?

"A. I met her a couple of times on the street. She kept . . . trying to seduce me with drugs. I never wanted nothing to do with her.

"Q. Nothing that would cause you to think that she would falsely accuse you of being there in that basement?

"A. I don't know.

"Q. Based on your past with her?

"A. I don't know. A woman scorn[ed] could do anything.

"Q. *Now she's scorn*[*ed*]?

"A. Like I told you, she tried to seduce me, entice me with narcotics on several occasions, but I don't do heroin.

"Q. *And did you get the sense from her testifying that she was trying to seduce you at that point when she was up there crying for hours in a row, refusing to look over at you*?

"A. She stuck her tongue out at me. What do you mean?

"Q. She stuck her tongue out at you?

"A. Yes, she did. You saw it." (Emphasis added.)

[10] The following exchange occurred between the prosecutor and the defendant:

"Q. And how many times did you say you've been arrested before?

"A. You know.

"Q. Well, I'm asking you. I don't testify. How many times have you been arrested?

"A. Forty. Thirty something, forty something.

"Q. Based on those numerous interactions with the police, you didn't think you had the right to read through the statement before you signed it?

"A. I've never had to sign a statement, ever, never, never, never. I [have] never been questioned by detectives, never, ever, ever, never. Is that enough nevers for you? Never.

"Q. No, it's not because—

"A. I can tell you never—I [have] never been arrested. I [have] never been questioned. [I] never went through this. . . . I never went through this. I never did this before.

"Q. *Come on*. You said that [one of the police officers], the good guy, had brought you down and questioned you about this case in the past?

"A. I didn't have to sign nothing.

"Q. But you just testified that you [had] never been questioned before, ever, ever, ever?

"A. [He] [w]asn't question[ing] [me]. He ask[ed] me, would I give [a] blood sample and would I give [a] hair sample.

"Q. Those end with a question mark. Aren't those questions?

"A. And I said, yes. I didn't have to sign anything to say yes. I said yes.

* * *

"Q. Okay. Your testimony is, as I understand it . . . I don't know nothing about what happened in the basement?

"A. Exactly.

"Q. Did it surprise you when they put in front of you a three, almost four full page statement of single spaced typed lines and asked you to sign off on it? Did that cause you to think, boy, I don't know anything about this case. I wonder why there's so much stuff in this statement?

"A. I signed it and I initialed it. . . . But for the nineteenth time, I didn't read it. I did not read it. I didn't want to read it. I didn't care about reading it. I just wanted to sign it and go back downstairs and be locked away so that way . . . we can move on to where we are right now and—

"Q. Did it cause you any concern or *did it pop a light bulb in your head*, boy, there's a lot of typed up words on here; I wonder why there's so many?

"A. There's a lot of typed up words in the newspaper; that mean[s] nothing." (Emphasis added.)

[11] The prosecutor argued: "Now, *the defendant, by anybody's estimation and certainly by this evidence, is a hardened criminal.* He's been in and out of . . . jail his entire adult life. I don't condemn him for that. I don't ask you to say, oh, he's a bad man, he must be guilty, but I ask you to think about—think about how that would affect your dealings with the police. He's been arrested dozens and dozens of times. It's not like it's somebody who's never had any interaction with the police and can't handle himself in the police department. He has numerous felony convictions, in and out of jail his entire life. Did he strike you, during his testimony, and during how he carefully chose the words that he responded to the questions to, and how he would challenge me—that's fine, how he would challenge the judge at times. That's fine. I have . . . no problem with that. But think about whether or not that's consistent with his claim that he didn't know what he was signing, that he didn't read it. You saw him. Does he strike you as the kind of person who would go along with what the police were saying without having a little bit of an untrusting eye when he looked at what they were putting in front of him? That is a key point in this case. His familiarity with the police department, his distrust of them. By his own words, he finds them to be violent; he finds them to be manipulative. Is that the kind of person who's going to go in and sign a statement without reading it? *It just doesn't make any sense.* He knew he was in trouble. The police told him from moment one when they put him in the back of the patrol car, we have an arrest warrant for you for murder. He's questioned by Detective [George] Tirado during day one, questioned over, and over, and over again. Questioned by [Sergeant Michael] Slavin and Tirado on day two over, and over, and over again. And his testimony just *flies in the face of common sense* because, after all that, of course, the police thought he had something to do with it. They were telling him what other witnesses had said. They were telling him what . . . Russell had said. How can it possibly be that, at that point, he signs off on the statement and he thinks it's to get him out of trouble? *Does that make any sense at all*?" (Emphasis added.)

[12] Defense counsel argued: "I asked, and you heard me ask, and you heard the answer: Does the Waterbury Police Department, the Detective Bureau, have the capacity to videotape interviews? Do they have the capacity? And the answer is, yes. We have the capacity. We can do that. And if they did that, we wouldn't even be playing around with this. You have cell phones. I have a cell phone. I could probably record my closing arguments, stand right here and do that. They have the capacity. It was 1999. They could have done it. No. I stand corrected, it was 2009. They could have done it.

"Yeah. It's more accurate for a police officer to say he signed these rights forms than if the police officer were to say, 'I told him his rights.' Yeah, it's more accurate for a police officer to say he signed this statement than if a police officer came in and said, 'He told me he didn't.' But this is the age of technology, and this is the age where we can eliminate questions, we can eliminate uncertainty, we can eliminate accusations, very, very, simply. It doesn't take a whole lot. They have the capacity."

[13] The prosecutor argued: "[Defense counsel] stands up [and says], 'beyond

a reasonable doubt, beyond a reasonable doubt. It's way up here.' You heard what beyond a reasonable doubt is in the introductory remarks from the judge before we even picked you all as jurors. And the one thing you heard is it's a human burden. It's a burden that can be borne by a prosecutor. It doesn't mean—and I asked each and every one of you—it doesn't mean the perfect case. It doesn't mean absolutely 100 percent to a scientific certainty. Those cases don't exist. The law acknowledges that there are frailties in human memory, that there are—there is always something that can come up that you can think about, well, why didn't they do this? Why didn't they do this? What about the hair on the face, right? *There is not one shred of evidence, not one shred of evidence, that that hair has any importance at all in this case*, but what the defense attorney wants you to do is say, 'that's reasonable doubt.' That's not reasonable doubt. There is no evidence about what it was. . . . Keep in mind the one reason that we are here. The one reason we are here is because [the defendant] got himself in a drug frenzy and started to choke the life out of [the victim] in order to take her property by force." (Emphasis added.)

[14] The prosecutor argued: "Now, one of the most powerful tools that you have in your arsenal of common sense is to observe witnesses on the stand. You all are seated in such a fashion that you are close to the witness stand. You can watch how people act. You can watch how they respond to questions. You can watch the expressions on their face[s]. And I think it's not hard, based on this evidence, to remember . . . Russell's reaction when she testified in this case. Her actions physically on the witness stand were consistent with someone who was terrified. Do you remember when there were those long pauses and one especially long pause when I asked her to identify the defendant? She couldn't—she couldn't physically look at him. She had her hand up, right on the witness stand, her hand up almost her entire testimony blocking a view toward the defendant. Use your common sense. Why do you think that is? Why would she be so afraid? Why would she keep silent for so long? Because she lived in these streets that the defendant ran for years and years. That's why she didn't say anything. And you got to see how she acted on the witness stand."

The prosecutor subsequently argued: "And you have . . . Russell, okay. Is she the perfect witness? Does she, you know, have a long work history, and go to church on Sundays, and volunteer to help people? No. She's a heroin addict. Who do you all expect to be in a basement on Burton Street getting high? You know, we take the witnesses as we find them. The fact that she's a heroin addict corroborates her testimony that she was in the basement. She went there to get high. Did she seem like she was proud of what she was? Absolutely not. But think about how hard it must be to get on the witness stand and come in and say all those embarrassing things about yourself. Yeah, I wanted to get high. Yes, I am a heroin addict. Yes, I went and I scored drugs, and I went into the basement and shot them up. She has a family. You heard about that. She has kids. The fact that she would come in and say those things, which are so embarrassing to her, and that *she would be trembling, trembling, physically trembling, crying uncontrollably almost, during her testimony*, supports the fact that she was being truthful. And her testimony corroborates the police testimony because much of what she says happens is what the police say they heard from the mouth of the defendant. And look to her demeanor on the stand." (Emphasis added.)

[15] The prosecutor argued: "And, you know, the claim that Russell's testimony—somehow she got it wrong. She has all the right people in the basement at 17 Burton Street. She has the body found within five or ten feet of where she describes the frenzy, the attack, the choking, the soon to be sexual assault. Within feet of where the body is found is where she says it started. And, you know, all this crime scene stuff. People watch too much [Crime Scene Investigation]. *If things—details don't line up perfectly like they do on TV*, where they find a twig, or a hair, and, all of the sudden, the whole case is busted wide open. This is a homicide from [twelve, thirteen] years ago. Use your common sense and look at the major details that all do line up. She describes a physical attack on [the victim]. The body of [the victim] supports that. The statement that the defendant gave in writing, and verbally, to the police support[s] [Russell's] version of events. The medical examiner supports her version of events. She says, once things started to go sour, she got out of there." (Emphasis added.)

[16] The prosecutor argued: "Now, one of the things that prosecutors sometimes get in trouble [for] in closing arguments is saying what they believe, okay. *My function here is not to convince you that I believe the defendant is guilty*. What my opinion is does not matter. What I'm here to do is to ask you to use your God given, everyday common sense. Look at the evidence in the case, consider what the witnesses said, look at things like corrobora-

tion, look at things like the demeanor of the witnesses on [the] stand, and draw your own conclusions about what the state has proven in this case. *I'm not here to convince you that I think he's guilty.* What I'm here to do is to try and convince you that when you look at the evidence in this case critically, use your everyday common sense. Look at it critically and make your own decision. And the inescapable conclusion, once you look at all the evidence in this case, is that the defendant is clearly guilty. We have an eyewitness and a confession." (Emphasis added.)

[17] The prosecutor argued: "It's a burden that can be borne by a prosecutor. It doesn't mean—and I asked each and every one of you—it doesn't mean the perfect case. It doesn't mean absolutely 100 percent to a scientific certainty. Those cases don't exist. The law acknowledges that there are frailties in human memory, that there are—there is always something that can come up that you can think about, well, why didn't they do this? Why didn't they do this? What about the hair on the face, right? There is not one shred of evidence, not one shred of evidence, that that hair has any importance at all in this case, but what the defense attorney wants you to do is say, 'that's reasonable doubt.' That's not reasonable doubt. There is no evidence about what it was. *They have access to the state forensic lab, they can put on witnesses if they want to from the lab.* Don't be led down that path. Keep in mind the one reason that we are here. The one reason we are here is because [the defendant] got himself in a drug frenzy and started to choke the life out of [the victim] in order to take her property by force. *And I don't have to prove the moment of death,* and I don't have to prove that he's the one [who] inflicted the fatal blow. As to the felony murder count, all I have to prove is that these guys were in on a robbery trying to get that crack cocaine, and, as a result of that robbery, is that she ended up dead. That's it." (Emphasis added.)

[18] General Statutes § 53a-133 provides: "A person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny."

[19] Four of the questions related to the defendant's medication, and the other question related to the defendant's drug addiction:

(1) "Specify whether the court found that the defendant was supposed to be taking mental health medication . . . at the time of the custodial interrogation and, if so, who prescribed said medication";

(2) "Specify whether the court found that the defendant's inhibitions were reduced by the lack of his mental health [medication]";

(3) "Specify whether the police knew or had reason to know or inquire as to whether the defendant was taking mental health [medication]";

(4) "Specify whether the defendant was suffering from the effects of withdrawal from crack cocaine at the time of the custodial interrogation, and specify the factual and legal bases for that conclusion"; and

(5) "Specify whether the defendant was suffering from a diagnosed mental illness, whether that condition was bipolar disorder or some other mental condition, and, if so, whether the Waterbury Police Department had reason to know or inquire concerning said mental illness."

[20] The defendant does not contest the fact that he was given his *Miranda* warnings pursuant to *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).